Daniel RAMOS, et al., Plaintiffs,

v.

STATE OF ILLINOIS,
et al., Defendants.

POLITICAL ACTION CONFERENCE
OF ILLINOIS, et al., Plaintiffs,

v.

Richard M. DALEY, et al., Defendants.

Nos. 90 C 7211, 90 C 7447.

United States District Court,
N.D. Illinois, E.D.

Dec. 30, 1991.

Barry Thomas McNamara, Roger L. Price, Steven E. Gilman, Ann H. Theodore, D'Ancona & Pflaum, Arturo Jauregui, Mexican American Legal Defense & Educational Fund, Ruben Castillo, Kirkland & Ellis, Chicago, Ill., for Daniel Ramos, et al. in No. 90 C 7211.

Arturo Jauregui, Mexican American Legal Defense & Educational Fund, Ruben Castillo, Kirkland & Ellis, Chicago, Ill., for Puerto Rican Parade Committee.

James R. Carroll, Roger Philip Flahaven, Michael Joseph Hayes, Kenneth M. Sullivan, Illinois Atty. General's Office, John Joseph Madden, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, Ill., for James R. Thompson. Neil Hartigan, State Bd. of Election Com'rs, John J. Lanigan, in No. 90 C 7211.

Michael Levinson, Bd. of Election Com'r, Chicago, Ill., for Chicago Bd. of Election Com'rs, Michael J. Hamblet, in No. 90 C 7211.

Kelly Raymond Welsh, Emily Nicklin, Susan R. Lichtenstein, Sharon Baldwin, Andrew S. Mine, City of Chicago, Law Dept. Corp. Counsel, Chicago, Ill., for Richard M. Daley, City Council of the City of Chicago in No. 90 C 7211.

Joel T. Pelz, Jerold Sherwin Solovy, Barry Sullivan, Thomas Charles Buchele, Bon-

nie B. Koch, Jenner & Block, Richard A. Devine, A. Bonoma and William K. Blanchard, Jr., Pope & John, Ltd., Chicago, Ill., for Anthony C. Laurino, et al., intervenor defendants in Nos. 90 C 7211 and 90 C 7447.

Paul L. Strauss, Jeffrey Irvine Cummings, Mark Steven Kende, Judson H. Miner, Allison S. Davis, Davis, Miner, Barnhill and Galland, P.C., Chicago, Ill., for plaintiffs in No. 90 C 7447.

Kelly Raymond Welsh, Susan R. Lichtenstein, Sharon Baldwin, Andrew S. Mine, City of Chicago, Law Dept. Corp. Counsel, Chicago, Ill., for Richard M. Daley, City Council of the City of Chicago in No. 90 C 7447.

Michael Levinson, Bd. of Election Com'r, Chicago, Ill., for Board of Elections Com'n of the City of Chicago in No. 90 C 7447.

James R. Carroll, Roger Philip Flahaven, Michael Joseph Hayes, Kenneth M. Sullivan, John Joseph Madden, Illinois Atty. General's Office, for James R. Thompson, Neil Hartigan, Atty. Gen., State of Illinois Bd. of Election Com'rs in No. 90 C 7447.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

In *Ramos v. State of Illinois*, No. 90 C 7211, a class comprised of all citizens and qualified voters in Chicago whose right to vote has been or will continue to be abridged by the existing aldermanic election/redistricting schedule, brought an action for injunctive and declaratory relief. That action first sought to delay the spring 1991 aldermanic elections until after the City redistricted on the basis of the 1990 census figures. Unsuccessful in that effort, *see* Memorandum and Order of February 8, 1991, 1991 WL 18183, the *Ramos* plaintiffs filed a second amended complaint. They now seek a new map based on the 1990 census figures, and a special aldermanic election by at least the scheduled March 1992 general elections, based on the new map. In *PACI v. Daley*, No. 90 C

7447, a class comprised of all African-American residents, citizens and voters of Chicago, seek essentially the same relief as the *Ramos* plaintiffs now seek. In light of that action the *Ramos* plaintiffs have now proposed that their class be all non-African-American citizens and qualified voters in Chicago whose rights to vote have been or will continue to be abridged by the existing aldermanic election/redistricting schedule. The plaintiffs in both actions have moved for class certification.

The City and State defendants, and the defendant intervenors, have all opposed the *Ramos* class as originally proposed. The City defendants oppose the *PACI* class as well. The thrust of the opposition is that the *Ramos* class (City, State and intervenor defendants), and the *PACI* class (City), are too broadly defined to meet the Rule 23(b)(2) requirements of commonality and typicality, and that, in *Ramos* at least, the plaintiffs will not be able to fairly and adequately protect the interests of the class because the proposed class has within it antagonistic and conflicting interests. Those arguments are impacted by the *Ramos* plaintiffs' proposed new class definition, and we turn to the present posture of the cases in those circumstances.

The *Ramos* plaintiffs complain that the present election schedule violates the rights of Hispanic voters because a substantial increase in the number of Hispanic citizens in Chicago will not be recognized until the 1995 elections, despite the availability of new census data in 1991 (Counts I and V), and that same delay in recognizing population shifts within the City violates the right of each citizen to have his or her vote have a weight equal to the weight of the vote of others (Counts II and III). The *PACI* plaintiffs, in complaining of population malapportionment, focus on its impact upon African-American voting strength, while at the same time claiming violations of equal voting rights generally.

The various defendants contend that the *PACI* class was but a subset of the original *Ramos* class and that they have, or at least had prior to the 1991 election, differing interests in this litigation. Recognizing the

force of that argument, the *Ramos* plaintiffs have now removed the *PACI* class from their class definition. The defendants, or at least some of them, go on to urge a variety of possible conflicts within the proposed classes that still leave the proposed classes inappropriate vehicles for resolving the issues raised.

Plaintiffs point out, and defendants can hardly disagree, that a class action under Rule 23(b)(2) is the typical vehicle for raising remap and election issues of this nature, *see, e.g., Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). The issue is whether claims common to the class will be raised and vigorously prosecuted by their claimed representatives. That raises concerns about levels of generality. In a democratic society one would hope that all citizens would be equally concerned about fair representation and equal voting power. There is a reflection of that in the diversity of the *Ramos* plaintiffs. Clearly, however, a major thrust of the *Ramos* complaint is that Hispanic voting power has been diluted and that Hispanics are entitled to more representation. That increased representation necessarily would come at the expense of some other group, which may be African–Americans who, in *PACI,* are claiming that demographic trends have diluted their voting strength. We see that as the only real antagonism in the originally proposed *Ramos* class.

We could carry the levels of generality further. Voters of whatever derivation who live in over-represented wards might prefer to have an unequal voting weight system continue. Some Hispanics and African–Americans may, for any number of reasons, feel they benefit from the continuation of the present system. Perhaps we should have a class of all citizens who believe their rights are abridged by population imbalances in the present map, and separate classes of Hispanic citizens and African–American citizens who believe their ethnic or racial representation is diluted by the present map. We do not, after all, have to individually identify the class members in a Rule 23(b)(2) class—and the above is a basic generic description of

those who are complaining here. We think, though, that the classes presently proposed will serve the purpose, *see Williams v. State Bd. of Elections,* 696 F.Supp. 1559 (N.D.Ill.1988), and we certify the proposed classes.

■ All defendants have filed a motion to dismiss, and those we now grant. We have awaited developments subsequent to the February 8, 1991 Memorandum and Order, but we see no reason to wait further, and we believe the plaintiffs are entitled to pursue an appeal of what is wholly a legal issue.

The earlier opinion described the Illinois statutory scheme as it applied up to December 1, 1991. Since that opinion the final census figures have become available and, while they apparently remain the subject of litigation, they provide, until and unless changed, the appropriate bases for redistricting. *McNeil v. Springfield Park District,* 851 F.2d 937, 946 (7th Cir.), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). The Chicago City Council has sought to agree on a new ward map prior to the December 1, 1991 statutory deadline, and the proposals reported in the newspapers (judges do read them on occasion) indicate that the recent census figures support, or at least may support, substantially increased Hispanic aldermanic representation and some increase in African–American representation.

The City Council's efforts have failed. That means that further Illinois statutory provisions come into play. If the City Council fails to redistrict, then any ten aldermen may petition to have a proposed redistricting ordinance placed on the ballot for referendum approval at the next election (which here means March 20, 1992). Ill.Rev.Stat. ch. 24, ¶ 21–40. There could be as many as ten proposed maps on the ballot. The map favored by the most voters or, if only one ordinance is proposed and it is favored by a majority of the voters, thereafter becomes law. Ill.Rev. Stat. ch. 24, ¶ 21–42.

The *Ramos* plaintiffs have recently urged that the failure to remap means that

the election of ward committeemen should not go ahead in March 1992, from districts based on outdated 1980 census figures, an issue not, at least presently, before this court. That failure to redistrict does, however, cast into doubt some of the relief sought by plaintiffs here, as the statutory scheme now does not provide for adoption of a new aldermanic map until the election in which plaintiffs wish new aldermanic elections to be held. These events are not directly relevant to the pending motions to dismiss, but they require this amplified review of the statutory scheme presently under attack.

That statutory scheme, adopted long ago and now impacted by a delay in the release of official census figures, results once every 20 years in the election of aldermen shortly before final census figures are released—which aldermen shall serve to the fifth year after the census data was gathered. A new map may not be adopted until almost a year after census data becomes final, if this adoption must be by referendum, and too late for any special election of aldermen in the next general election, although the statutory scheme provides a means for adoption of a new map by referendum at that election if the City Council fails to redistrict. Thus there is a means to redistrict well prior to the next scheduled aldermanic election, even if the legislative body fails to act. Does that statutory scheme violate the Voting Rights Act or constitutional norms? We think not.

Plaintiffs do not claim that the statutory scheme was adopted for a discriminatory purpose, nor could they. It has been, substantially, in place for almost 50 years. The most they can claim is that an effort toward the end of the 1990 General Assembly session to change that system failed to pass. That does not make this an intentional discrimination case. The *Ramos* plaintiffs, but not the *PACI* plaintiffs, do allege intentional discrimination, but they do so in a circular fashion: because defendants failed to change an unconstitutional system they intend to perpetuate it. The thrust of plaintiffs' claims has to be and is that a system that locks into place elected officials for four years, shortly before a redistricting on the basis of new census data becomes possible, cannot pass muster. We disagree.

Reapportionment following a decennial census is the constitutional norm, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *reh'g denied*, 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1969), and we are not aware of anything that suggests that Congress intended to change that standard for the purposes of the Voting Rights Act. Indeed, that standard was followed in *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), a Voting Rights Act case. That standard is expressly set forth in *Reynolds*, 377 U.S. at 583–584, 84 S.Ct. at 1392–93:

That the Equal Protection Clause requires that both houses of a state legislature be apportioned on a population basis does not mean that States cannot adopt some reasonable plan for periodic revision of their apportionment schemes. Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States, often honored more in the breach than the observance, however. Illustratively, the Alabama Constitution requires decennial reapportionment, yet the last reapportionment of the Alabama Legislature, when this suit was brought, was in 1901. Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as

a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

We should be clear about what is *not* involved in these cases. The statutory time frame was not adopted to protect incumbents for a period after the census figures become available. In the past, census data have been available for reapportionment for the first general election after the census was taken. *See Skolnick v. Chicago,* 415 F.2d 1291 (7th Cir.1969), *cert. denied,* 397 U.S. 954, 90 S.Ct. 984, 25 L.Ed.2d 138 (1970), and *Cousins v. City Council of Chicago,* 466 F.2d 830 (7th Cir.), *cert. denied,* 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151 (1972). For reasons which have been previously described, those figures were not available in time for an adjustment of ward boundaries prior to the March 1991 election. Nor are we talking about extraordinarily long terms. Aldermen serve for four years, well within the usual terms of office. From the time that the census figures were available to the end of their term is not much more than the 28 months an appointed alderman may serve under state law. *See Lynch v. Illinois State Bd. of Elections,* 682 F.2d 93 (7th Cir.1982). Clearly, also, decennial reapportionment necessarily means that terms of office under an old but then valid map will extend into the period when updated census figures are available, since terms necessarily extend to the first general election pursuant to a new map. That terms for some offices are longer than terms for others is a truism and, indeed, one justification of bicameral legislatures. *See Reynolds,* 377 U.S. at 577, 84 S.Ct. at 1389. Plaintiffs' contentions, if adopted, would appear to effectively ban any elections during the year or so preceding regularly scheduled redistricting.

We are not dealing with an unreasonably delayed reapportionment procedure, as in *Flateau v. Anderson,* 537 F.Supp. 257 (S.D.N.Y.1982), which extends the life of an old map through a general election held well after an intervening census. Further, we recognize that one remedy for elections held pursuant to a map defective in its inception is a shortened term followed by special elections, *Skolnick v. Illinois State Electoral Bd.,* 307 F.Supp. 691, 697 (N.D.Ill.1969), but no one contends that the map that finally emerged in 1985 was in any way then vulnerable to attack.

We do not mean to suggest that the present map can be used for another general election in the event that no reapportionment is approved by referendum, or the plan approved by the voters violates the Constitution or the Voting Rights Act. *See Lucas v. Forty–Fourth General Assembly,* 377 U.S. 713, 736–737, 84 S.Ct. 1459, 1473–74, 12 L.Ed.2d 632 (1964). We recognize, however, that "legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so," *Reynolds, supra,* 377 U.S. at 586, 84 S.Ct. at 1394, and we believe that the Illinois statutory scheme is a rationally conceived plan, tied to the decennial census, to accomplish the necessary periodic adjustment.