**Charles FRENCH, et al.,**

v.

**Bill BONER, Mayor, et al.**

No. 3:91–0312.

United States District Court,
M.D. of Tennessee,
Nashville Division.

March 2, 1992.

George Edward Barrett, Douglas S. Johnston, Jr., Phillip A. Purcell, Barrett, Johnston & Parsley, Nashville, Tenn., for plaintiffs Charles French, Ludye Wallace, Durward Hall, Raymond Thomasson, Maryda Coldwick, George Nelson Glover, Marian L. Stevenson and Mary L. Crawley.

James Lawrence Charles, Patricia Jean Cottrell, James Leo Murphy, III, Susan Short Jones, Nashville, Tenn., for defendants William Boner, David Scobey, Metropolitan Council, Jan Bushing, Jeff Browning, Planning Com'n, Metropolitan Nashville, Davidson County, Tenn., Eddie Bryant, Kathy Summers and Election Com'n, Davidson County.

## MEMORANDUM

HIGGINS, District Judge.

The Court has before it the motions for summary judgment of the plaintiffs (filed December 31, 1991; Docket Entry No. 54) and of the sole remaining defendant, the Metropolitan Government[1] (filed January 21, 1992; Docket Entry No. 58). The parties conceded in open court that there is no genuine issue as to a material fact and, therefore, that summary judgment is appropriate. Therefore, for the reasons discussed below, the Court grants the motion for summary judgment of the defendant Metropolitan Government, denies the motion for summary judgment of the plaintiffs, and dismisses the case.

## I. FACTS AND PROCEDURAL HISTORY

The Metropolitan Government conducts general elections every four years on the

---

**1.** The Metropolitan Government is the only party necessary for any relief to which the plaintiffs may be entitled. Therefore, all other defen-

dants were dismissed pursuant to an agreed order entered May 1, 1991 (Docket Entry No. 5).

first Thursday in August to elect the Mayor, Vice Mayor, thirty-five single-district Metropolitan Council members and five Metropolitan Council members-at-large. The plaintiffs and the Metropolitan Government agree that the Council districts apportioned in October 1981 pursuant to the 1980 federal decennial census are malapportioned in light of the 1990 federal decennial census.

In their amended complaint, the plaintiffs sought a declaratory judgment that the Council as it existed before the August 1, 1991 election was malapportioned, and the United States Constitution required reapportionment before the August 1, 1991, election. The plaintiffs also requested that the Court either order the Council to adopt a new, properly apportioned redistricting plan, or implement its own plan before the August election. Finally, the plaintiffs requested that the Court enjoin the councilmanic elections until the Council districts are properly apportioned according to the results of the 1990 federal census. The defendants moved to dismiss the action for lack of subject matter jurisdiction because the action was not ripe, and for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).

By order entered June 27, 1991 (Docket Entry No. 43), the Court granted the defendant's motion to dismiss for lack of subject matter jurisdiction because the action was not ripe. The Court explained that "legislative reapportionment is primarily a matter for legislative consideration and determination, and ... judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Memorandum at 16 (entered June 27, 1991; Docket Entry No. 42) (quoting *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506, 541 (1964)). The Court found that the defendant had not "had an 'adequate opportunity' after receiving the latest census data to adopt a new redistricting plan and failed." Memorandum at 16. Therefore, since the Supreme Court has determined that legislative districts must be reapportioned at least

every ten years to avoid becoming constitutionally suspect, *Reynolds*, 377 U.S. at 583–84, 84 S.Ct. at 1392–93, 12 L.Ed.2d at 539–40, this Court held that the defendant had until October 1991 to adopt a new redistricting plan. Memorandum at 16. Until then, the Court declined to predetermine whether a constitutional violation had occurred. *Id.*

The Court of Appeals, also relying on *Reynolds*, affirmed this Court's decision to not enjoin the August 1, 1991, election. *French v. Boner*, 940 F.2d 659 (6th Cir. 1991) (unreported disposition). The Court of Appeals, however, concluded "that the issue of whether the impending election may be conducted, or must be enjoined, is ripe for decision," since "the necessary facts are known" which would allow the court to reach an effective decision. *Id.* The Court of Appeals therefore vacated this Court's order dismissing the case on ripeness grounds, and remanded the case for further consideration of the remaining issues. *Id.*

## II. DISCUSSION

The plaintiffs in the seminal case of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) sued under 42 U.S.C. §§ 1983 and 1988, alleging essentially that the 1901 Tennessee statute apportioning seats in the state General Assembly denied them "the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes." *Id.* at 187–88, 82 S.Ct. at 694, 7 L.Ed.2d at 668 (quoting the complaint). The district court dismissed the action for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. *Id.* The Supreme Court held that the district court had subject matter jurisdiction, and "that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief...." *Id.* at 197–98, 82 S.Ct. at 699, 7 L.Ed.2d at 674. The Supreme Court specifically declined "to consider what remedy would be most appropriate if appellants

prevail at the trial." *Id.* at 198, 82 S.Ct. at 699, 7 L.Ed.2d at 674.

Two years later, in *Reynolds,* the Supreme Court was faced with the task "of determining the basic standards and stating the applicable guidelines for implementing [the] decision in *Baker v. Carr.*" *Reynolds,* 377 U.S. at 559, 84 S.Ct. at 1380, 12 L.Ed.2d at 525. *Reynolds,* like *Baker,* was a case challenging the apportionment of a state legislature. In *Reynolds,* the Supreme Court reaffirmed the concept of "one person, one vote" it had announced in *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821, 830 (1963). The Court also recognized

> that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status.

*Reynolds,* 377 U.S. at 566, 84 S.Ct. at 1384, 12 L.Ed.2d at 529–30. The Court was aware, however, that there may exist circumstances under which the mandate of "one person, one vote" might not be achieved, but under which an apportionment scheme might still pass constitutional muster. The Court queried: "Our problem, then, is to ascertain ... whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment of seats in state legislatures." *Id.* at 561, 84 S.Ct. at 1381, 12 L.Ed.2d at 526–27.

 The Supreme Court found just such a "constitutionally cognizable principle" in decennial reapportionment. The Court's language bears reprinting in full:

That the Equal Protection Clause requires that both houses of a state legislature be apportioned on a population basis *does not mean that States cannot adopt some reasonable plan for periodic revision of their apportionment schemes. Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth....* Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. *In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation.*

*Id.* at 583–84, 84 S.Ct. at 1392–93, 12 L.Ed.2d at 539–40 (emphasis added).[2] The defendant in this case, the Metropolitan Government, has a plan for decennial reapportionment. There is no dispute that the defendant, unlike the defendants in *Baker* and *Reynolds,* follows this plan. Nor is there any dispute that the plan based on the 1990 federal decennial census is constitutional.[3] Therefore, under *Reynolds,*

---

**2.** *Reynolds* was applied to "the election of local government officials from districts of disparate population" by *Avery v. Midland County,* 390 U.S. 474, 478–79, 88 S.Ct. 1114, 1117, 20 L.Ed.2d 45, 50 (1968).

**3.** In its prior decision, this Court refused to enjoin the August 1, 1991, election. *French v. Boner,* 771 F.Supp. 896 (M.D.Tenn.1991). The

election was held under the 1981 apportionment plan. Subsequently, on September 5, 1991, a run-off election was held. At the same time, the voters of Metropolitan Nashville and Davidson County approved the 1991 plan of reapportionment submitted by the Metropolitan Council. There is no claim that the 1991 plan either intends to, or has the effect of, discriminating on the basis of race. Nor is there any claim

there is no constitutional violation.[4] Since the Equal Protection Clause does not require more, the defendant's motion for summary judgment must be granted.

The cases cited by the plaintiffs are distinguishable on their particular facts, and do not alter the basic teaching of *Reynolds.* Plaintiffs most strenuously argue that *Sudekum v. Hayes,* 414 F.2d 41 (6th Cir. 1969) is controlling in this case. Plaintiffs' response to defendant's motion for summary judgment at 21 (filed January 31, 1992; Docket Entry No. 63). In *Sudekum,* the Sixth Circuit affirmed a summary judgment of this Court applying the "one man, one vote" rule to a plan reapportioning the legislative districts for the Quarterly County Court of Sumner County. *Sudekum,* 414 F.2d at 43.[5]

The parties before the district court in *Sudekum* conceded that the Quarterly County Court was malapportioned. *Id.* (appendix A). After several hearings at which reapportionment plans were proposed and rejected, the district court implemented a reapportionment plan substantially similar to one proposed by the defendants. *Id.* at 43–44. The court ordered a special election under the new plan and ordered the newly elected Justices of the Peace to hold office until their successors were elected at the next regularly scheduled general election. The Court also ordered the present Justices of the Peace, who had been elected under the old plan, to "consider only routine mat-

ters" at their meeting on July 14, 1969. *Id.* at 44–45.

*Sudekum* is a well-reasoned case in which the court remedied an unconstitutionally structured apportionment scheme. However, it does not control the Court's decision in this case. The case presently before the Court involves a constitutionally permissible plan of decennial reapportionment, toward the end of which there were population imbalances. *Reynolds,* 377 U.S. at 583, 84 S.Ct. at 1393, 12 L.Ed.2d at 540. By contrast, there is no discussion of a similar, regularly scheduled reapportionment plan in *Sudekum,* a case decided five years after the Supreme Court decided *Reynolds.*

The "reasonably conceived plan" of decennial reapportionment is, of itself, sufficient to guarantee the constitutionality of the councilmanic elections held August 1, 1991. *Reynolds,* 377 U.S. at 583, 84 S.Ct. at 1393, 12 L.Ed.2d at 540. No more is required. There being no such plan in effect in *Sudekum,* the court was justified in holding special elections and imposing other restrictions on the interim Justices of the Peace. "[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and ... judicial relief becomes appropriate only when a legislature fails to reapportion according to constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Id.* at 586, 84 S.Ct. at 1394, 12 L.Ed.2d at 541. Since the defendant Met-

---

that the Metropolitan Charter, under which the plan was devised, violates the Tennessee or United States Constitutions.

**4.** Legislative reapportionment more frequently than every ten years, although *not required,* is permissible. *Reynolds,* 377 U.S. at 583–84, 84 S.Ct. at 1393, 12 L.Ed.2d at 540; *Garza v. County of Los Angeles,* 918 F.2d 763, 772 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). "The Court has never hinted that plaintiffs claiming present Voting Rights Act violations should be required to wait until the next census before they can receive any remedy." *Garza,* 918 F.2d at 772–73.

Plaintiffs in the case before the Court, therefore, misinterpret *Reynolds* and *Garza* when they argue that the Sixth Circuit has already "implicitly rejected" the rule announced by the Court today by finding that this case is ripe for

adjudication. Plaintiffs' response to defendant's motion for summary judgment at 12 (filed January 31, 1992; Docket Entry No. 63). The Court of Appeals held that the case was ripe because "the necessary facts are known as to the August 1, 1991, election." *French v. Boner,* 940 F.2d 659 (6th Cir.1991) (unpublished disposition). This was not a case, by contrast, where "the abstractness of the wrongs involved prevent meaningful or effective adjudication." *Id.* (citing *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ).

**5.** The issue on appeal was not that the district court's proposed plan violated the "one man, one vote" rule. Rather, it was that the proposed plan violated Article 6, Section 15 of the Tennessee Constitution. *Sudekum,* 414 F.2d at 42. This Court, therefore, will focus on the opinion of the district court in *Sudekum,* as that is the opinion on which the plaintiffs rely.

ropolitan Government did reapportion in a constitutional manner within ten years of the 1981 reapportionment, no judicial action is appropriate.

The other cases cited by the plaintiffs also are distinguishable. In *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), the Ninth Circuit affirmed the district court's requirement of redistricting between regularly scheduled elections based on decennial reapportionment. *Id.* at 777. The special elections were ordered by the court, not because of population imbalances between censuses, but because the apportionment plan adopted by the county in 1981 both intended to, and had the effect of, diluting Hispanic voting strength. *Id.* at 769–72. By contrast, there is no claim that either the 1981 or the 1991 Davidson County reapportionment plans intend to or have the effect of discriminating on the basis of race.

The New York City Board of Estimate was composed of the elected presidents of the five city boroughs and three members elected at-large. *Board of Estimate v. Morris*, 489 U.S. 688, 690, 109 S.Ct. 1433, 1436, 103 L.Ed.2d 717, 725 (1989). The composition of the board violated the Equal Protection Clause of the Fourteenth Amendment because there was "gross deviation" in the population of the boroughs, and each of the borough presidents had equal voting power on the board. *Id.* at 692–94, 109 S.Ct. at 1437–38, 103 L.Ed.2d at 726–28. There was no "reasonably conceived plan" of reapportioning the board based on population. *Reynolds*, 377 U.S. at 583, 84 S.Ct. at 1393, 12 L.Ed.2d at 540. Instead, the city argued that the composition of the board should not be changed since it "accommodates natural and political boundaries as well as local interests," and it "has been effective." *Board of Estimate*, 489 U.S. at 702, 109 S.Ct. at 1442, 103 L.Ed.2d at 733.

*Watkins v. Mabus*, 771 F.Supp. 789 (S.D.Miss.1991) *aff'd*, —— U.S. ——, 112 S.Ct. 412, 116 L.Ed.2d 433 (1991) is the case cited by the plaintiffs which is most closely analogous to the case presently before the Court. The Mississippi Constitution was amended in 1979 to require reapportionment of the state legislature in 1982 and every ten years thereafter. *Watkins*, 771 F.Supp. at 791 n. 1. The legislature was reapportioned in 1982, and again in 1991 (although it was not required to be reapportioned until 1992). *Id.* at 792. By this time, under the 1982 plan, there was a large population deviation between districts. *Id.* at 791. Indeed, the district court held that, "although the legislative districts under the 1982 plan are doubtless unconstitutionally malapportioned for a full four-year term of office, ... they may be constitutionally utilized for interim relief." *Id.* at 807. As the 1991 legislative election was imminent, and the 1991 plan had not been approved, the district court ordered that the election be held under the 1982 plan, and that the legislators elected under that plan hold office until a new plan could be approved. *Id.* At that time, the court would order a special election under the new plan. *Id.*

It appears to this Court that the district court in *Watkins* was acting as a quasi-arbitrator between the parties. The Mississippi Legislature took upon itself the task of reapportionment one year before it was constitutionally required. For many reasons, both racially and politically motivated, the legislature could not devise a plan based on the 1990 federal decennial census before the upcoming election. Given those specific facts, the district court reached a result which, although not constitutionally mandated, was constitutional.

The Supreme Court's one-sentence affirmance of the district court's holding in *Watkins* does not shed any light on the matter.[6] Therefore, the Supreme Court not having specifically overruled the well-established and well-reasoned rule in *Reyn-*

---

**6.** The entire Supreme Court decision is a full paragraph. However, all but one sentence of the decision concerns absentee ballot procedures, an issue not before this Court.

olds,[7] this Court believes that *Reynolds* is still the controlling law. The district court in *Ramos v. Illinois*, 781 F.Supp. 1353 (N.D.Ill.1992), a case decided after the Supreme Court affirmed *Watkins*, reached this same conclusion.

In *Ramos*, a class of qualified Chicago voters sought injunctive and declaratory relief to postpone the regularly scheduled spring 1991 aldermanic elections until after the city reapportioned the districts based on the 1990 federal decennial census.[8] *Ramos*, 781 F.Supp. at 1354. The plaintiffs claimed that holding elections under the current plan "violates the rights of Hispanic voters because a substantial increase in the number of Hispanic citizens in Chicago will not be recognized until the 1995 elections, ... and that same delay in recognizing population shifts within the City violates the rights of each citizen to have" their vote count as much as every other vote. *Id.* Unsuccessful in their attempt, the *Ramos* plaintiffs next sought to require redistricting and a special election based on the 1990 federal decennial census no later than the March 1992 general elections. *Id.*

The district court held that the statutory scheme for reapportioning the aldermanic districts violated neither the Voting Rights Act nor constitutional norms. *Id.* at 1356.

> The thrust of the plaintiffs' claims has to be and is that a system that locks into place elected officials for four years, shortly before a redistricting on the basis of new census data becomes possible, cannot pass muster. We disagree. Reapportionment following a decennial census is the constitutional norm, and we are not aware of anything that suggests that Congress intended to change that standard for the purposes of the Voting Rights Act.

*Id.* at 1356 (citing *Reynolds*, 377 U.S. at 583–84, 84 S.Ct. at 1392–93, 12 L.Ed.2d at 539–40).

The Supreme Court, in deciding *Reynolds*, considered the lag-time that would inevitably arise between decennial censuses and regularly scheduled reapportionment following the census. This gap was built into the *Reynolds* formula. As long as there exists a "reasonably conceived plan" for periodic reapportionment, with reapportionment taking place no less frequently than every ten years, no voter's constitutional rights are abridged. *Reynolds*, 377 U.S. at 583, 84 S.Ct. at 1393, 12 L.Ed.2d at 540.

"Mathematical exactness," although desirable, is neither required nor "a workable constitutional requirement." *Id.* at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536. That is not to say that we should not strive to achieve the goal of "one person, one vote." It is a basic premise of our system of government that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964). However, if this Court were to require the defendant to hold a special election, the Court surely would be opening a pandora's box of litigation. The Court could be required to determine, at each election, whether the legislative districts are still constitutionally apportioned based on the most recent decennial census. If they are, will they continue to be? Will the Court need to maintain jurisdiction between elections? If they are not, what plan will be implemented? These examples may seem extreme at first glance, but upon further contemplation they are very possible. Since the Supreme Court has determined that decennial reapportionment following the federal census meets constitutional standards, this Court will not require more.

### III. CONCLUSION

For the reasons discussed above, the defendant's motion for summary judgment is

---

**7.** In fact, the Supreme Court did not cite *Reynolds* in its decision in *Watkins*.

**8.** The city of Chicago follows essentially the same plan for reapportioning aldermanic (or councilmanic) districts as the defendant Metro-politan Government in this case. Both are required to reapportion following the federal decennial census. In addition, both governing bodies are elected for four year terms in the same years (i.e., 1987, 1991, 1995).

granted. The plaintiffs' motion for summary judgment is denied. Accordingly, the case is dismissed with prejudice.