Charles FRENCH, Raymond Thomasson, Maryda Colowick, Marian L. Stevenson, Mary L. Crawley, Plaintiffs–Appellants,

Mary Johnson, Intervening Plaintiff,

v.

Bill BONER, et al., Defendants,

Metropolitan Government of Nashville, Davidson County, Tennessee, Defendant–Appellee.

No. 92–5325.

United States Court of Appeals, Sixth Circuit.

Argued April 9, 1992.

Decided May 8, 1992.

Rehearing Denied June 9, 1992.

George E. Barrett (argued and briefed), Douglas S. Johnston, Jr., Phillip A. Purcell, Nashville, Tenn., for plaintiffs-appellants.

Patricia Jean Cottrell, James L. Charles, James L. Murphy (argued and briefed), Metro Legal Dept., Nashville, Tenn., for defendant-appellee.

Before: MERRITT, Chief Judge; KEITH, Circuit Judge; and CELEBREZZE, Senior Circuit Judge.

MERRITT, Chief Judge.

The question in this municipal reapportionment case is whether the Equal Protection Clause requires the City of Nashville to conduct new elections for 35 local legislators before their four-year terms expire in 1995. Nashville conducted its last city election for its 35 district council members according to a legislative apportionment plan based on the 1980 census figures rather than the 1990 census figures. The City held the election in August 1991, as required by its Charter. The Census Bureau did not make the 1990 census figures available to the city until a date in the spring of 1991. The date was too late for the City to devise and adopt a completely new districting plan and put it into effect with sufficient notice to allow candidates to qualify and campaign prior to the impending August city election.

Because of population shifts from 1980 to 1990, the largest of the 35 council districts has almost three times as many people as the smallest district. There are large deviations from the average in many other districts as well, deviations that the parties agree will not pass constitutional muster if the council districts currently in effect must be tested against the 1990 census rather than the 1980 census under which the plan was drawn.

The question before us is whether the City has a constitutional duty to rerun the elections held just after the new decennial census data became available in 1991 but before the old apportionment plan could be changed and a new one put into effect prior to the impending election. As the plaintiffs put the question, "Should the court allow the city to use the old 1980 census figures for 15 years when the districts are now grossly malapportioned under the 1990 census and the city has adopted a new constitutional plan to be used for the 1995 elections?"

We conclude, as did District Judge Higgins, that new elections are not required.[1] In any system of representative government, it is inevitable that some elections for four-year or longer terms will occur on the cusp of the decennial census. The terms inevitably will last well into the next decade; and, depending on shifts in population in the preceding decade, the representation may be unequal in the sense that the districts no longer meet a one-person-one-vote test under the new census.

Even after the reapportionment revolution that Chief Justice Warren believed constituted the most significant set of constitutional decisions of his tenure, *The Memoirs of Chief Justice Earl Warren* 306 (1977), mathematical equality in representation is not required at all times during the census and election cycles. Values other than mathematical equality in preserving majority rule are also at stake. In order to maintain relative mathematical equality in a population constantly on the move, we would have to have short terms of office and annual census updates. Short terms would sacrifice the stability and experience in office that longer terms contribute. Refusal to honor the preference of

1. Judge Higgins concluded his opinion below by pointing out his view of the consequences of a contrary holding: "However, if this Court were to require the defendant to hold a special election, the Court surely would be opening a pandora's box of litigation. The Court could be required to determine, at each election, whether the legislative districts are still constitutionally apportioned based on the most recent decennial census. If they are, will they continue to be? Will the Court need to maintain jurisdiction between elections? If they are not, what plan will be implemented? These examples may seem extreme at first glance, but upon further contemplation they are very possible. Since the Supreme Court has determined that decennial reapportionment following the federal census meets constitutional standards, this Court will not require more."

state and local bodies for longer terms would increase the costs of elections for taxpayers and candidates and would make it more difficult for citizens of limited means to participate in local elective politics. If new elections were ordered here, the process would undermine the settled expectations that both voters and elected officials hold as a result of the election last year.

For these reasons the Supreme Court has never drawn hard and fast rules about the length of terms or how long after a decennial census year new elections under the new census must be conducted. The principles of mathematical equality and majority rule are important, but we should not allow them to outweigh all other factors in reviewing the timing of elections. In *Reynolds v. Sims,* 377 U.S. 533, 583, 585, 84 S.Ct. 1362, 1392–93, 1393–94, 12 L.Ed.2d 506 (1964), Chief Justice Warren wrote that the Court was not imposing a rule that "decennial reapportionment is a constitutional requirement," although less frequent apportionment "would assuredly be constitutionally suspect." The Court also noted that where "an impending election is imminent and a state's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediate relief in a legislative reapportionment case, even though the existing apportionment scheme was found invalid." *Reynolds,* 377 U.S. at 585, 84 S.Ct. at 1394.

Due to the logistics of scheduling elections with four-year terms under the Nashville Charter, the first election after the 1980 census came in 1983, allowing council members to serve malapportioned districts for three years in the 1980s. Due to the difficulty of remapping those districts prior to the most recent 1991 elections, the newly elected council members will serve for five years into the decade of the 1990s. Thus, the 1980 census figures will govern for twelve years rather than ten years. We do not believe that considerations of mathematical equality in representation or the presumption in favor of redistricting every ten years outweigh the considerations outlined above concerning the validity of four-year terms, the settled expectations of voters and elected officials, the costs of elections, and the need for stability and continuity of office.

We find no case authority contrary to this position and no law review or text material discussing the point at issue. In our representative democracy the courts are charged with the responsibility of keeping the channels of representative government and majority rule open and free from significant dilution of voting strength under the one-person-one-vote principle. *See* John Hart Ely, *Democracy and Distrust* 121–15 (1980). Nevertheless, there must be some tolerances in the machinery of majority rule under the Equal Protection Clause in order to take into account the values outlined above, as well as the practicalities of the local electoral processes established by states and cities for their own self-government. Summary judgment for the City was therefore appropriately granted.

We allow the intervention of Mary Johnson, pursuant to Fed.R.App.P. 27 and Sixth Circuit Rule 8, as requested by plaintiffs.

Accordingly, the judgment of the District Court is AFFIRMED.