976 F.2d 335
 POLITICAL ACTION CONFERENCE OF ILLINOIS, Timuel Black, Al
Johnson, Joseph Gardner, Timothy C. Wright, Jackie Grimshaw,
William Moorehead, Danny Davis, Jr., Maxine Spencer,
individually and on behalf of all others similarly situated,
Plaintiffs-Appellants,
v.
Richard M. DALEY, City Council of the City of Chicago, Board
of Elections Commission of the City of Chicago, Jim Edgar,
Governor, Roland W. Burris, Attorney General, State of
Illinois Board of Election Commissioners, Defendants-Appellees,
and
Anthony C. Laurino, Patrick Huels, Bernard Hansen, John
Madrzyk, Ginger Rugai, Mark Fary, John J. Buchanon, Theris
M. Gabinski, William Banks, Patrick O'Connor, Eugene
Schulter, Lemuel Austin, Jr., Richard Mell, Patrick
Levar, James J. Laski, Edwin Eisendrath, Thomas Cullerton,
Bernard L. Stone, Mary A. Smith, Thomas W. Murphy, Michael
Wojcik, Carole Bialczak, Theodore Mazola, Edward M. Burke,
Intervenors-Appellees.
Daniel RAMOS, League of Women Voters of Chicago, Linda D.
Coronado, Eleanor Elam, Betty Willhoite, Mimi Gilpin,
Dietrich Reitzes, Hilde Reitzes, Josefina Gallegos, Roberto
E. Gonzalez, Puerto Rican Parade Committee, Plaintiffs-Appellants,
v.
CHICAGO BOARD OF ELECTION COMMISSIONERS, Michael J. Hamblet,
Chairman, State Board of Election Commissioners, John J.
Lanigan, Chairman, Richard M. Daley, Mayor of the City of
Chicago, City Council of the City of Chicago, James R.
Edgar, Governor of the State of Illinois, Roland W. Burris,
Attorney General of the State of Illinois, Defendants-Appellees,
and
Patrick Huels, Mark Fary, John Madrzyk, Edward M. Burke,
Arenda Troutman, Carole Bialczak, Theris M. Gabinski,
Richard Mell, Lemuel Austin, Jr., William Banks, Anthony C.
Laurino, Patrick O'Connor, Burton Natarus, Edwin Eisendrath,
Bernard Hansen, Patrick Levar, Eugene Schulter, Mary A.
Smith, Bernard L. Stone, Theodore Mazola, Thomas W. Murphy,
Ginger Rugai, James J. Laski, Michael Wojcik, Thomas
Cullerton, Intervenors-Appellees.
 Nos. 92-1031, 92-1076.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 2, 1992.
Decided Sept. 24, 1992.
As Corrected Sept. 29 and Oct. 6, 1992.
 
 Judson H. Miner (argued), Paul Strauss, Allison S. Davis, Mark S. Kende, Jeffrey Cummings, Davis, Miner, Barnhill & Galland, Roger Price, Barry T. McNamara, Ann H. Theodore, D'Ancona & Pflaum, Ruben Castillo, Kirkland & Ellis, Arturo Jauregui (argued), Ricardo Meza, Mexican American Legal Defense & Education Fund, Chicago, Ill., for plaintiffs-appellants.
 Joel T. Pelz (argued), Jerold S. Solovy, Jenner & Block, Michael Levinson, Board of Election Com'rs, Rosalyn B. Kaplan, Kenneth M. Sullivan, and John J. Madden, Asst. Attys. Gen., Office of the Attorney General, Sharon Baldwin, Jean Dobrer, ACC, Lawrence Rosenthal, DCC, Kelly R. Welsh, ACC, Susan R. Lichtenstein, Benna R. Solomon (argued), Andrew S. Mine, Office of the Corporation Counsel, Chicago, Ill., for defendants-appellees.
 Jerold S. Solovy, Barry Sullivan, Joel T. Pelz, Thomas C. Buchele, Bonnie B. Koch, Jenner & Block, Richard A. Devine, William K. Blanchard, David A. Bonoma, Pope & John, for intervenors-appellees.
 James R. Carroll, Michael J. Hayes, Roger Flahaven, Kenneth M. Sullivan, and John J. Madden, Asst. Attys. Gen., Office of the Attorney General, Chicago, Ill., for defendant-appellee Jim Edgar.
 Before BAUER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 In this consolidated appeal, we review the district court's final order dismissing the complaints in Ramos v. State of Illinois, ("Ramos"), and Political Action Conference of Illinois v. Daley, ("PACI"), 781 F.Supp. 1353 (N.D.Ill.1991). The Ramos and PACI plaintiffs filed their original complaints in December 1990. The Ramos plaintiffs purported to represent a class consisting of all registered voters, specifically Hispanics, whose voting rights allegedly would be violated if Chicago's 1991 aldermanic elections were allowed to proceed. The PACI plaintiffs also purported to represent a class consisting of all registered voters, but specifically African-Americans, whose voting rights also would be infringed if the 1991 elections took place.
 
 
 2
 Both the PACI and Ramos complaints challenge Illinois' statutory scheme governing the redistricting of aldermanic wards in Chicago. The complaints raised one-person, one-vote claims under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, the Fourteenth Amendment of the United States Constitution, and Article I, Section 2 and Article III, Section 3 of the Illinois Constitution. In addition, the Ramos complaint asserted a claim under the Fifteenth Amendment. The district court determined that Illinois' redistricting plan for Chicago was not unconstitutional and did not violate the Voting Rights Act. We affirm.
 
 
 3
 The present statutory election schedule for Chicago's aldermanic elections was established in 1943. Pursuant to that schedule, in February of every fourth year, a non-partisan election for alderman is held in each of Chicago's fifty wards. See Ill.Rev.Stat. ch. 24, pp 21-22, 21-25, 21-32. If no candidate in a particular ward receives fifty-percent or more of the total vote, an April run-off election is held between the two candidates who received the most votes in the February election. See Ill.Rev.Stat. ch. 24, p 21-26. The newly elected aldermen take office shortly after the April election and serve four-year terms. See Ill.Rev.Stat. ch. 24, p 21-22.
 
 
 4
 State law also governs the schedule for the periodic redrawing of the boundaries of the aldermanic wards. Under state statute, the Chicago City Council must redraw the City's ward boundaries every ten years based on the data derived from the most recent United States decennial census. This redistricting is to be completed by December of the year following the year in which the national census is taken. See Ill.Rev.Stat. ch. 24, p 21-38. Until redistricting is completed, all aldermanic elections must be held from existing wards. Thus, Illinois' redistricting scheme for Chicago's wards required the City Council to redraw the ward boundaries, using the 1990 census figures, on or before December 1, 1991. The February and April 1991 aldermanic elections therefore would be based upon the ward boundaries established by the 1980 census. That plan (hereinafter the "1985 plan" or the "1985 map") was approved by the district court in 1985. See Ketchum v. Byrne, 740 F.2d 1398 (7th Cir.1984), cert. denied, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), on remand, 630 F.Supp. 551 (N.D.Ill.1985). The 1985 plan controlled the 1987 and 1991 aldermanic elections.
 
 
 5
 The United States Census Bureau was required to release the 1990 census figures in April 1991. See 13 U.S.C. § 141(c). In fact, the figures were released on February 11, 1991, just fifteen days before the February 26 aldermanic election. These census figures indicate that Chicago's Hispanic population increased between 1980 and 1990. The new census shows that Hispanics constitute a majority in six wards. Under the 1985 plan, there currently are only four Hispanic aldermen in Chicago's City Council. The plaintiffs assert that a map based on the new census figures will enable voters to elect at least two additional Hispanic aldermen. See Plaintiffs' Appendix at A-35.
 
 
 6
 The new census also shows that Chicago's African-American population decreased between 1980 and 1990, from 1,197,000 to 1,074,471. As of 1990, African-Americans constituted 38.6% of the City's population, as compared with 39.8% in 1980. See Plaintiffs' Appendix at A-18. The 1985 ward map provided for twenty wards in which the majority of the population was African-American, with nineteen of these wards having a super-majority of African-Americans--in excess of sixty-five percent. Eighteen African-American aldermen were elected in both the 1987 and 1991 elections. The PACI plaintiffs alleged that studies of the new census figures showed that the 1985 map fractured and diluted African-American voting strength. See Plaintiffs' Brief at 5-6.
 
 
 7
 Chicago's aldermanic elections were held on February 26, 1991. The plaintiffs do not assert that redistricting of Chicago's wards using the just-released 1990 census figures was possible before the February 26th election. As required by state law, that election, and the run-off election held on April 2, 1991, were based upon the 1985 map. The aldermanic candidates who were successful in those elections took office in May 1991, serving four-year terms.
 
 
 8
 Pursuant to state law, the newly-elected City Council attempted to adopt a new map based upon the 1990 census figures. None was passed before the December 1, 1991 statutory deadline. State law dictates that if the City Council fails to redistrict, then any ten aldermen may petition to have a proposed redistricting ordinance placed on the ballot for referendum approval at the next election, in this case, in March 1992. See Ill.Rev.Stat. ch. 24, p 21-40. Following these procedures, two different groups of aldermen--28 in one group and 19 in the other--presented ward maps to the voters. The voters chose between the two maps at the March 1992 election.
 
 
 9
 On December 27, 1991, the district court dismissed the plaintiffs' complaints for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). See Ramos, 781 F.Supp. at 1357. The court determined that, as a matter of law, Illinois' redistricting scheme, as implemented in the 1991 elections, violated neither constitutional requirements nor the Voting Rights Act. The district court stated:
 
 
 10
 The thrust of plaintiffs' claims has to be and is that a system that locks into place elected officials for four years, shortly before a redistricting on the basis of new census data becomes possible, cannot pass muster. We disagree. Reapportionment following a decennial census is the constitutional norm, and we are not aware of anything that suggests that Congress intended to change that standard for the purposes of the Voting Rights Act ... We are not dealing with an unreasonably delayed reapportionment procedure.... [W]e believe that the Illinois statutory scheme is a rationally conceived plan, tied to the decennial census, to accomplish the necessary periodic adjustment.
 
 
 11
 Id. at 1356-57.
 
 
 12
 On appeal, the plaintiffs essentially attempt to defend the validity of their claims. We note that we review the district court's dismissal de novo. Lister v. Stark, 890 F.2d 941, 954 (7th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990). We accept the plaintiffs' well-pleaded allegations as true and draw all reasonable inferences in the plaintiffs' favor. Leahy v. Board of Trustees of Community College District No. 508, 912 F.2d 917, 921 (7th Cir.1990). Applying this standard, we hold that the district court properly determined that the plaintiffs fail to state a claim upon which relief may be granted.[1]
 
 
 13
 As the district court observed, Illinois' statutory scheme results once every twenty years in the election of aldermen shortly before or immediately after the final census figures are released. Ramos, 781 F.Supp. at 1356. This scheme for decennial reapportionment necessarily means that terms of office under an "old" map (i.e. based upon a previous census) will extend into the period when updated census figures are available, since terms will extend to the first general election pursuant to a new map. Id. at 1357. Thus, data from every other census (i.e. the 1980 census and then the year 2000 census) may control aldermanic representation for fifteen years after the census is taken.[2] The plaintiffs' complaints question whether this statutory scheme violates the Voting Rights Act or constitutional norms?
 
 
 14
 The Supreme Court set out the standard to resolve this question in Reynolds v. Sims, 377 U.S. 533, 583-84, 84 S.Ct. 1362, 1392-93, 12 L.Ed.2d 506 (1964):
 
 
 15
 Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States, often honored more in the breach than the observance, however.... Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practically desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.
 
 
 16
 These words demonstrate that the Illinois statutory scheme for reapportionment passes constitutional muster. Illinois requires decennial redistricting that tracks the figures from the most recent census. That Chicago elects its aldermen to serve four-year terms causing a temporary delay in the implementation of the new census data every twenty years does not transform Illinois' scheme into an unconstitutional procedure. As the above excerpt from Reynolds makes clear, decennial reapportionment satisfies the Constitution, even though there undoubtedly will be "some imbalance" in the population of each district towards the end of the decennial period. Id.
 
 
 17
 The plaintiffs, however, do not subscribe to this interpretation of Reynolds. "The problem," write the plaintiffs, "is that it focuses on a formality--drawing a new ward map--and not on the result that redistricting is supposed to influence--legislative representation." Plaintiffs' Brief at 30. According to the plaintiffs, the Illinois redistricting scheme violates the logic of Reynolds by its failure to implement the 1990 census data immediately into the 1991 elections:
 
 
 18
 When the Supreme Court in Reynolds v. Sims wrote that redistricting every ten years is a constitutional minimum, it could not have meant that a municipality could redistrict every ten years, but avoid the effects of redistricting by delaying elections based on the new map until four years after redistricting takes place.
 
 
 19
 Plaintiffs' Brief at 30.
 
 
 20
 Yet the plaintiffs overlook that, as the district court found, the 1991 elections were not the result of "an unreasonably delayed reapportionment procedure." Ramos, 781 F.Supp. at 1357. The 1990 census figures became available only two weeks before the February 26, 1991 election. Redrawing Chicago's ward for that election using the new census data was not possible. Redistricting is complex; obtaining new census data is merely the first step toward developing and approving a new map for the City. Therefore, the critical question is whether the 1991 election, which was based on a ward map approved in 1985 using 1980 census data, was valid under Reynolds? Reynolds' explicit language concerning the probable "imbalance" in the map toward the end of the decennial period demonstrates that Chicago's 1991 election represents no constitutional violation. We hold that the district court properly dismissed the plaintiffs' constitutional claims for a failure to state a claim upon which relief may be granted.
 
 
 21
 Plaintiffs also assert that the district court erred when it dismissed their claims under the Voting Rights Act, 42 U.S.C. § 1973. Among other things, that act "prohibits the use of voting rules to abridge exercise of the franchise on racial grounds." South Carolina v. Katzenbach, 383 U.S. 301, 316, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). A violation of the Voting Rights Act is established if it is shown that the processes leading to election in the relevant political subdivision are not equally open to participation by members of a given class of citizens. See 42 U.S.C. § 1973(a) and (b). In the instant case, the plaintiffs claim that the Chicago's 1991 aldermanic elections denied African-Americans and Hispanics an equal opportunity to participate in the political process and elect representatives of their choice. See Plaintiffs' Brief at 18-19. Although they acknowledge that the 1985 map originally was valid, the plaintiffs assert that that map has "grown" to have a discriminatory effect due to "population movements between regularly-scheduled decennial redistricting." Id. at 26. Yet, such is not the stuff of a Voting Rights Act violation. While we do not dispute, nor even question, many of the arguments presented in the plaintiffs' brief, we find that they simply do not support the notion that the Illinois redistricting scheme is unlawful.
 
 
 22
 For instance, the plaintiffs rely on the Supreme Court's recent decision in Chisom v. Roemer, --- U.S. ----, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), on remand, 970 F.2d 1408 (5th Cir.1992), to assert that we must afford the Voting Rights Act wide application. There, in a suit by African-American voters challenging the system of electing Louisiana Supreme Court Justices from multi-member districts, the Court held that state judicial elections are included within the ambit of the Voting Rights Act. Yet, the broad scope of the Act does not mean that the Illinois redistricting scheme is unlawful. On the contrary, we find that the Illinois procedure fully comports with the Act.
 
 
 23
 The Sixth Circuit apparently agrees with this reasoning. In French v. Boner, 963 F.2d 890, 891 (6th Cir.1992), the question before the court was "whether the City [of Nashville, Tennessee] ha[d] a constitutional duty to rerun the elections held just after the new decennial census data became available in 1991 but before the old apportionment plan could be changed and a new one put into prior to the impending election." The court concluded that new elections were not required:
 
 
 24
 In any system of representative government, it is inevitable that some elections for four-year or longer terms will occur on the cusp of the decennial census. The terms inevitably will last well into the next decade; and depending on shifts in populations in the preceding decade, the representation may be unequal in the sense that the districts no longer meet a one-person-one-vote test under the new census.... [But] we do not believe that considerations of mathematical equality in representation or the presumption in favor of redistricting every ten years outweigh the considerations outlined above concerning the validity of four-year terms, the settled expectations of voters and elected officials, the costs of elections, and the need for stability and continuity of office.
 
 
 25
 Id. at 891-92.
 
 
 26
 Like the Sixth Circuit, we see no requirement that Chicago alter its legitimate decennial redistricting scheme or change its customary four-year term length for aldermen in order to avoid the predictable and temporary delay that occurs once every twenty years in implementing the new census figures. Id. at 892. As the election year pattern demonstrates, supra at note 2, the 1980 census figures were used in three elections, in 1983, 1987, and 1991. These elections span only eight years, surely not an unreasonable amount of time for particular census data to control elections. See Reynolds, 377 U.S. at 583-84, 84 S.Ct. at 1392-93. The four-year terms that Chicago aldermen serve merely indicate that every fifth election (i.e. when the election year falls on the same year that the new census data becomes available) likely will result in a four-year delay in using the new census data. But this simple consequence of the two different schedules (i.e. census every ten years, elections every four) does not diminish the voting power of any protected minority; there is merely a four-year time lag that occurs every other decade between redistricting and elections. Thus, accepting their allegations as true, we hold that the plaintiffs can prove no set of facts that would lead us to believe that the Illinois redistricting scheme denies any class of citizens full participation in Chicago's political process. As the Supreme Court made clear in Chisom, "Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of ridding the country of racial discrimination in voting." Chisom, --- U.S. at ----, 111 S.Ct. at 2368. Illinois' redistricting scheme does not violate that pronouncement.
 
 
 27
 For the foregoing reasons, we AFFIRM the district court's order dismissing the plaintiffs' complaints.
 
 
 
 [1]
 Although neither notice of appeal identified the precise counts upon which the Ramos and PACI plaintiffs based their appeals, their opening brief essentially raises three claims: (1) claims under the Fourteenth Amendment's Equal Protection Clause, see Plaintiffs' Brief at 28; (2) claims under the Voting Rights Act, see id. at 15; and (3) claims of discriminatory intent also under the Fourteenth Amendment, see id. at 33-34. The plaintiffs apparently have not preserved their claims under the Illinois Constitution and, therefore, have presented no state constitutional arguments in their opening brief. Because we hold that the plaintiffs fail to state a claim under either the Fourteenth Amendment or the Voting Rights Act, we need not specifically address their claims of discriminatory intent
 
 
 [2]
 The chart below displays this pattern:
 Election Census as Basis
Year for Election
1975 1970 Census
1979 1970 Census
1983 1980 Census
1987 1980 Census
1991 1980 Census
1995 1990 Census
1999 1990 Census
2003 2000 Census
2007 2000 Census
2011 2000 Census
2015 2010 Census