Donnie Ray FAIRLEY, et al., Plaintiffs,

v.

FORREST COUNTY, MISSISSIPPI, et al., Defendants.

Civ. A. No. 2:91cv224(P)(N).

United States District Court, S.D. Mississippi, Hattiesburg Division.

Feb. 23, 1993.

Ellis Turnage, Cleveland, MS, for plaintiffs.

Jeffrey Hollimon, Hattiesburg, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This matter is before the Court on motions by both the plaintiffs and the defendants for partial summary judgment on the issue of whether special elections are required under the one-man, one-vote principle of the Equal Protection Clause of the Fourteenth Amend- ment and on plaintiffs' Motion for Class Certification. Having reviewed the parties' briefs and authorities cited, having heard oral arguments and being otherwise fully advised in this matter, the Court finds as follows, to-wit;

## STANDING

On October 21, 1991, the plaintiffs, Donnie Ray Fairley and Willie D. Hinton, filed a voting rights action against Forrest County, Mississippi, Forrest County Election Commission and Edith McLeod alleging that the proposed and existing supervisory redistricting plan used to elect county supervisors and election commissioners in Forrest County, Mississippi minimized black voting strength and thus violated the Fourteenth and Fifteenth Amendments to the United States Constitution, as well as Sections 2 and 5 of the Voting Rights Act of 1965. Subsequently, on June 1, 1992, the plaintiffs moved to amend their complaint to raise an additional claim for an alleged violation of the one-man, one-vote principle. On July 17, 1992, the plaintiffs filed their amended complaint, which also added Teresa Holmes as a new plaintiff to the lawsuit. On April 20, 1992, the plaintiffs filed a Motion for Partial Summary Judgment on the one-man, one-vote issue (The plaintiffs filed their Motion for Partial Summary Judgment on the one-man, one-vote issue before they filed their Amended Complaint which included an alleged one-man, one-vote violation). On November 18, 1992, the defendants also filed a Motion for Partial Summary Judgment on the one-man, one-vote issue. The question of whether special elections are required under the one-man, one-vote principle is the only issue before this Court at this time.

The 1990 Census revealed the population of the supervisory beats in Forrest County (deleting from the figures college students who were not permanent residents) to be as follows: [1]

1. During oral arguments the parties both agreed that the correct calculation of the total deviation, which existed in Forrest County at the time of the 1990 Census, is set out in the affidavit submitted by Stone Barefield. The calculation as set forth in the plaintiffs' amended complaint is not correct since this calculation included college students who were not permanent residents of Forrest County. The 1980 Census data, which the 1983 plan was based upon, is not before the Court. However, the parties have acknowledged

| Dist. | TP | ID | DEV. | % DEV. |
|---|---|---|---|---|
| 1 | 12,614 | 12,996 | − 382 | − 2.93 |
| 2 | 12,654 | 12,996 | − 342 | − 2.63 |
| 3 | 13,144 | 12,996 | + 148 | + 1.13 |
| 4 | 11,622 | 12,996 | − 1,374 | − 10.57 |
| 5 | 14,949 | 12,996 | + 1,953 | + 15.02 |
| | 64,983 | | | 25.59 |

■ The Court finds that Donnie Ray Fairley and Teresa Holmes do not have standing to assert a one-man, one-vote claim. The two indicia of standing are (1) there must be an "injury in fact" and (2) the injury must be real, i.e., "the injury must not be so attenuated as to be imaginary." *See United States v. S.C.R.A.P.*, 412 U.S. 669, 688–90, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973). At the time of the November, 1991 elections, the plaintiff, Teresa Holmes, was not a registered voter. Although Ms. Holmes moved to Forrest County in June 1990, she did not register to vote until July 8, 1992. *See* Forrest County, Mississippi's Motion for Partial Summary Judgment, Exhibit A, Teresa Holmes' Application for Voter Registration. Since Ms. Holmes was not registered at the time of the November, 1991 elections, Ms. Holmes did not suffer an actual injury. *See Gladstone, Realtors v. Village of Bellewood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). (In order to have standing a person must show that they suffered some threatened or actual injury from the defendant.) Ms. Holmes failed to register for some two years after she was eligible to do so. She cannot complain of election results from an election in which she was not qualified to participate because of her own inaction. Thus, Ms. Holmes does not have standing to complain about the election results; however, Ms. Holmes has standing on whether the plan pre-cleared by the Justice Department passes constitutional muster for future elections.

■ In *Fairley v. Patterson*, the Fifth Circuit held that injury in one-man, one-vote actions "results only to those persons domiciled in the *underrepresented* voting districts." 493 F.2d 598, 603 (5th Cir.1974). Therefore, residents of overrepresented districts have no standing to sue. The plaintiff, Donnie Ray Fairley, is from district 2, which is an overrepresented district. *See* Forrest County, Mississippi's Motion for Partial Summary Judgment, ·Exhibit C, Affidavit of Stone D. Barefield, ¶ 22. Thus, Mr. Fairley lacks standing to assert the one-man, one-vote claim as set forth in the plaintiffs' amended complaint. Mr. Fairley's lack of standing relates only to the one-man, one-vote issue.

The plaintiff, Willie D. Hinton, is from district 3, which is underrepresented only by 1.13%. The Court has concern as to whether a plaintiff who comes from a district that is only underrepresented by 1.13% has suffered an actual injury. Is the damage imaginary where the deviation is slightly more than one percent? Certainly, if no beat had a deviation of more than 1.13%, there would be no one-man, one-vote issue involved in this case. That is clearly an acceptable deviation. Mr. Hinton may well have no standing on the one-man, one-vote issue; however, for purposes of this opinion the Court assumes that Mr. Hinton has suffered a real injury even though he comes from a district that is only underrepresented by 1.13%. Thus, the Court will assume that Willie D. Hinton has standing to assert a one-man, one-vote claim against the defendants.

## CLASS CERTIFICATION

■ In·the plaintiffs' amended complaint of July 17, 1992, a class action suit was asserted by the plaintiffs for the first time. On July 29, 1992, the plaintiffs filed a Motion for Class Action Certification.

The law in this circuit is clear "where 'the very nature of the rights [sought to be vindicated] requires that the decree run to the benefit not only of the named plaintiffs, but also for all persons similarly situated' then it is unnecessary to determine whether a class action is proper." *Cook v. Luckett*, 575 F.Supp. 485 (S.D.Miss.1983) (citing *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, Florida*, 493 F.2d 799, 812 (5th Cir.1974)). The Court finds that the declaratory and injunctive relief sought by the plaintiffs will have the same effect as a class action regardless of whether the Court certifies this matter as a

that the deviation of 25.59% results from popula- tion shift.

class action or not. If the plaintiffs prevail in their lawsuit, and injunctive or declaratory relief is granted, this relief will benefit all the members of the proposed class, i.e., voters who are underrepresented as well as the black citizens of Forrest County. Consequently, the Court finds that plaintiffs have "a 'personal stake in the outcome of the controversy' as to insure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Cook*, 575 F.Supp. at 489 (citing *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Thus, the proposed class will be adequately represented by the plaintiffs who brought this suit. It is not necessary to certify a class in order to properly litigate the issues presented in this case.

## SPECIAL ELECTION

This case does not concern itself with what population deviation is constitutionally acceptable. The 25.59% deviation involved in this case does not pass muster under controlling judicial precedents since it is not justified by a "rational state policy." Defendants make no attempt to defend this deviation.[2] The real question to be answered is how much time does a governmental body have to redistrict itself after a census report shows that the districts, which were previously constitutionally apportioned, have become malapportioned due to population shift? This question must be viewed with a realization that Congress has mandated that such reapportionment plans must be pre-cleared by the Justice Department in order to assure that the plans are not discriminatory under the Voting Rights Act of 1965. Besides preclearance, there must also be factored in the reasonable time necessary to assimilate the demographic information necessary for such reapportionment. Furthermore, the fact that reapportionment is a political as well as a constitutional process must also be taken into account. Those elected to office by the voters must have time to balance different competing political interests and discharge their constitutional responsibilities under a representative form of government. All of this takes time. The question before the Court is how much time should a governing body have to obtain data, make political decisions, obtain pre-clearance, to assure that there is no discrimination, and reapportion itself?

When courts perform their responsibility and determine that constitutional criteria are not satisfied and that an apportionment plan is unconstitutional, and order new elections, the courts are being obtrusive into matters that under our Constitution should be discharged by others—elected officials in legislative bodies. When special elections are ordered, persons who thought they were elected to a full term of office, find this not to be the case. The voters who participate find that things they thought were settled for four years (or for whatever the term of office) are not really resolved. The taxpayers have to again foot the bill. On the other hand, when malapportionment exists, voters participating in an election in an overpopulated district find that their votes were diluted.

Although the relative ratio of the influence of a voter in a district that is 25% overpopulated remains constant when compared with a voter in a district that is neither overrepresented or underrepresented, regardless of whether the populations in the districts are increased or deceased, the significance of this difference is diminished considerably as the total populations of the districts are increased. For instance, in a district of 100 voters, a single voter has an influence of 1%, while a similar voter in a district of 125 voters (25% overpopulated) has an influence of 8/10ths of 1% rather than 1%. In a district of 12,500 voters, when the ideal is 10,000 voters, a 25% deviation still exists. The ratio of influence of voters in each district is still .8 to 1. But an individual voter's ultimate influence in the two districts is .008 of 1% (1 divided by 12,500) compared to .010 of 1% (1

---

2. Had this case involved a 25.59% total deviation, after redistricting, and had defendants justified this deviation based upon a "rational state policy" it might well be that deviation to this extent would not violate the Constitution, as later discussed in this case. However, since defendants do not attempt to justify this deviation on the basis of a "rational state policy," for purposes of this opinion, the Court assumes this deviation to be constitutionally impermissible.

divided by 10,000); this assumes that 100% of the voters participate, which is never the case. Thus, it is seen that the difference in the actual influence of a voter in a district of 12,500 voters compared to a voter in a district of 10,000 voters is relatively insignificant (8/1000ths of 1% compared to 10/1000ths of 1%). When one gets away from simply comparing the ratio of the number of voters in two districts, and calculates the actual final impact, that is the influence that a voter has on the outcome of an election, the impact is almost infinitesimal. 2/1000ths of 1% (.00002) is really de minimis variation in actual voter influence.

It might be well to review the history of the one-man, one-vote principle. During the first half of the 20th century, there was a considerable shift in the population from rural areas to urban areas. However, state legislators were insensitive to these population changes. As the rural areas decreased in population and urban areas and towns increased in population, state legislatures, controlled by legislators elected from rural areas were reluctant to reapportion and transfer legislative power from rural areas to urban areas. Clearly, there were tremendously inequitable results in regard to state legislative districting plans prior to the 1960's. As is generally true, when one group holds a clearly inequitable position of power and refuses to relinquish that power or share it, a backlash develops. For every action there is a reaction. The pendulum swings. The reaction—the swinging of the pendulum—in the area of legislative restricting was the *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) decision followed by *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

The *Reynolds* case was preceded by three other cases which indicated the direction the Court was headed. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) the Court held that a suit challenging the constitutionality of a state's apportionment of its legislature under the Equal Protection Clause presented a "justiciable" issue. In *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), the Supreme Court held the Georgia County unit system applica-

ble in statewide primary elections was unconstitutional. In *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court upheld a constitutional attack on congressional redistricting that did not comply with one-man, one-vote. The congressional redistricting question was decided under the constitutional directive that members of the House should be elected "by the people" while the *Gray* and *Baker* cases were decided under the Equal Protection Clause of the Fourteenth Amendment. Prior to *Baker*, attempts to resolve state legislative apportionment problems, as well as congressional redistricting problems because they violated various provisions of the Constitution and applicable statutes had met with no success. *See Colegrove v. Barrett*, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262 (1946); *Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Mr. Justice Frankfurter speaking for the Court in *Colegrove v. Green* stated:

[T]his Court, from time to time, has refused to intervene in controversies. It has refused to do so because due regard for the effective working of our Government revealed this issue to be of a peculiarly political nature and therefore not meet for judicial determination.

... In effect this is an appeal to the federal courts to reconstruct the electoral process of Illinois in order that it may be adequately represented in the councils of the Nation. Because the Illinois legislature has failed to revise its Congressional Representative districts in order to reflect great changes, during more than a generation, in the distribution of its population, we are asked to do this, as it were, for Illinois.

328 U.S. at 552, 66 S.Ct. at 1199.

Of course no court can affirmatively remap the Illinois districts so as to bring them more in conformity with the standards of fairness for a representative system.

*Id.* at 553, 66 S.Ct. at 1200.

Also, prior to the 1960's, attempts to change state government procedures and policies in a number of areas had been brought to the Supreme Court under the clause guar-

antying to each state a Republican Form of Government. Mr. Justice Hughes speaking for the Court in *Ohio v. Akron Park District,* 281 U.S. 74, 50 S.Ct. 228, 74 L.Ed. 710 (1930) stated thusly:

As to the guaranty to every State of a republican form of government (Sec. 4, Art. IV), it is well settled that the questions arising under it are political, not judicial, in character and thus are for the consideration of the Congress and not the courts.

*Id.; see also Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (1936). The Court noted in *Baker v. Carr* that reliance on the Republican Form of Government Clause to reapportion legislatures "would be futile." *Baker,* 369 U.S. at 227, 82 S.Ct. at 715.

When the Supreme Court handed down the *Baker* decision it was charting an entirely new course. *Reynolds* was the natural consequence of *Baker.* In *Reynolds,* for the first time, the Equal Protection Clause of the Fourteenth Amendment, was determined to require state legislative apportionment on the basis of population. It is helpful to review in detail what the Supreme Court said in the *Reynolds* case. Accordingly, the following portions of that opinion, written by Mr. Chief Justice Warren, are excerpted:

We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection....

*Reynolds,* 377 U.S. at 566, 84 S.Ct. at 1384.

Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies.

*Id.* at 567, 84 S.Ct. at 1384.

The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races. We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis.

*Id.* at 568, 84 S.Ct. at 1385.

While mathematical nicety is not a constitutional requisite, one could hardly conclude that the Alabama House, under the proposed constitutional amendment, had been apportioned sufficiently on a population basis to be sustainable under the requirements of the Equal Protection Clause.

Legislative apportionment in Alabama is signally illustrative and symptomatic of the seriousness of this problem in a number of the States.

*Id.* at 569, 84 S.Ct. at 1385.

The numerical size of the two bodies could be made to differ, even significantly, and the geographical size of districts from which legislators are elected could also be made to differ. And apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house.

[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. *Mathematical exactness or precision is hardly a workable constitutional requirement.*

*Id.* at 577, 84 S.Ct. at 1389 (emphasis added).

[I]t may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, so long as a resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way. Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting. Lower courts can and assuredly will work out more concrete and specific standards for evaluating state legislative apportionment schemes in the con-

text of actual litigation.... Developing a body of doctrine on a case-by-case basis appears to us to provide the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment.

*A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible,* and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering.... Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.

... So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.

*Id.* at 578–79, 84 S.Ct. at 1390–91 (emphasis added).

A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, di-

rected only to the concerns of particular political subdivisions.... Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body.

*Id.* at 580–81, 84 S.Ct. at 1391–92.

Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States.... *Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system,* although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, *we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation.* While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation.

*Id.* at 583–84, 84 S.Ct. at 1392–93 (emphasis added).

However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics

and complexities of state election laws, and *should act and rely upon general equitable principles.* With respect to the timing of relief, *a court can reasonably endeavor to avoid a disruption of the election process* which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in *Baker v. Carr,* "any relief accorded can be fashioned in the light of well-known principles of equity."

*Id.* at 585, 84 S.Ct. at 1393 (citation omitted) (emphasis added).

We feel that *the District Court in this case acted in a most proper and commendable manner. It initially acted wisely in declining to stay the impending primary election* in Alabama, and properly refrained from acting further until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme, while initially stating some of its views to provide guidelines for legislative action. And it correctly recognized that *legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.*

*Id.* at 586, 84 S.Ct. at 1394 (emphasis added).

Mr. Justice Clark concurred in the result in *Reynolds,* but in his concurring opinion wrote:

But in my view, if one house of the State Legislature meets the population standard, representation in the other house might include some departure from it so as to take into account, on a rational basis, other factors in order to afford some representation to the various elements of the State.

*Id.* at 588, 84 S.Ct. at 1395 (Clark, J., concurring).

Mr. Justice Stewart also writing a concurring opinion said the Court should "... afford the State of Alabama full opportunity, consistent with the requirements of the Fed-eral Constitution, to devise its own system of legislative apportionment." *Id.* at 589, 84 S.Ct. at 1395 (Stewart, J., concurring).

Mr. Justice Harlan wrote a strongly-worded dissent. Justice Harlan stated:

Since it can, I think, be shown beyond doubt that state legislative apportionments, as such, are wholly free of constitutional limitations, save such as may be imposed by the Republican Form of Government Clause (Const., Art. IV, § 4), the Court's action now bringing them within the purview of the Fourteenth Amendment amounts to nothing less than an exercise of the amending power by this Court.

*Id.* at 591, 84 S.Ct. at 1396 (Harlan, J., dissenting). Justice Harlan's dissent was based upon the fact that the proponents of this Amendment when discussing it in Congress before it was submitted for ratification stated unequivocally that it would not affect suffrage in the various states. Justice Harlan points out that if it had affected suffrage, there would have been no need for the Fifteenth Amendment which provided that neither the United States or any state could abridge the right of any citizen to vote because of "race, color or previous condition of servitude." He made a similar argument as to the Nineteenth Amendment granting suffrage to women. He pointed out that Section 2 of the Fourteenth Amendment proves that the Fourteenth Amendment had no effect on suffrage. Section 2 provides:

... when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial offices of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being 21 years of age, and citizens of the United States ... the basis of representation therein shall be reduced ...

U.S. CONST. amend. XIV, § 2. This section, he argued, specifically recognized that a State could deny suffrage, but would be penalized if they did so. Mr. Justice Harlan continued:

It is difficult to imagine a more intolerable and inappropriate interference by the judi-

ciary with the independent legislatures of the States.

*Reynolds*, 377 U.S. at 615, 84 S.Ct. at 409 (Harlan, J., dissenting).

Generalities cannot obscure the cold truth that cases of this type are not amenable to the development of judicial standards. No set of standards can guide a court which has to decide how many legislative districts a State shall have, or what the shape of the districts shall be, or where to draw a particular district line. No judicially manageable standard can determine whether a State should have single-member districts or multimember districts or some combination of both. No such standard can control the balance between keeping up with population shifts and having stable districts. In all these respects, the Courts will be called upon to make particular decisions with respect to which a principle of equally populated districts will be of no assistance whatsoever. Quite obviously, there are limitless possibilities for districting consistent with such a principle. Nor can these problems be avoided by judicial reliance on legislative judgments so far as possible. Reshaping or combining one or two districts, or modifying just a few district lines, is no less a matter of choosing among many possible solutions, with varying political consequences, than reapportionment broadside.

... It is well to remember that the product of today's decisions will not be readjustment of a few districts in a few States which most glaringly depart from the principle of equally populated districts.

... In one or another of today's opinions, the Court declares it unconstitutional for a State to give effective consideration to any of the following in establishing legislative districts:

(1) history;

(2) 'economic or other sorts of group interests';

(3) area;

(4) geographical considerations;

(5) a desire 'to insure effective representation for sparsely settled areas';

(6) 'availability of access of citizens to their representatives';

(7) theories of bicameralism (except those approved by the Court);

(8) occupation;

(9) 'an attempt to balance urban and rural power';

(10) the preference of a majority of voters in the State.

So far as presently appears, the *only* factor which a State may consider, apart from numbers, is political subdivisions. But even "a clearly rational state policy" recognizing this factor is unconstitutional if "population is submerged as the controlling consideration...."

*Id.* at 621–23, 84 S.Ct. at 1412–14 (citations omitted).

Mr. Justice Harlan concluded "[f]or when, in the name of constitutional interpretation, the Court *adds* something to the Constitution that was deliberately excluded from it, the Court in reality substitutes its view of what should be so for the amending process." *Id.* at 625, 84 S.Ct. at 1414. At the time the decision in *Reynolds v. Sims* was handed down, it was noted that not only did the Supreme Court determine the legislative apportionment in Alabama to be in contravention of the Federal Constitution, but also five other states, Colorado, Delaware, Maryland, New York and Virginia. By the end of 1962, litigation was pending challenging the apportionment of state legislatures in at least 34 states. *Id.* at 556, 84 S.Ct. at 1378.

What brought about such a dramatic change in the judicial view of legislative apportionment? As the Court stated in *Reynolds*, referring to the Alabama situation, "[p]opulation-variance ratios of up to about 41 to 1 existed in the Senate, and up to about 16 to 1 in the House." *Id.* at 545, 84 S.Ct. at 1373. The Court noted despite the fact that the Alabama Constitution mandated decennial reapportionment, there had been no reapportionment since the 1901 scheme was implemented following the adoption of the current Alabama Constitution. The Court said, "... population growth and shifts had converted the 1901 scheme, as perpetuated some 60 years later, into an invidiously discrimina-

tory plan completely lacking in rationality." *Id.* The Court further noted, "[t]he spate of similar cases filed and decided by lower courts since our decision in *Baker* amply shows that the problem of state legislative malapportionment is one that is perceived to exist in a large number of the States." *Id.* at 556, 84 S.Ct. at 1378.

Rehashing the debates involved in the *Reynolds* case is not intended in the least to suggest that the majority opinion was wrong or that a different result should have been achieved, but those debates are brought forward to demonstrate that courts today should be cautious in their obtrusion into what otherwise would be a legislative matter. The courts approach problems like this in an altogether different manner than legislative bodies. Legislative bodies consider factors that the courts cannot and do not consider. They consider inconvenience to voters. They consider the practicality of how acts are to be implemented and how they will affect the functioning of government. They consider costs.

Our founding fathers brought forth a government with three distinct branches, executive, legislative and judicial. The legislative branch, popularly elected, has to explain its actions to the voters. They have to justify why and how they spend the taxpayers' money. When they disrupt long-established custom, precinct lines or other political subdivision lines that have long been in place, they have to explain. The federal judiciary, on the other hand, is freed from having to justify its actions to the voters, the citizens or the taxpayers. It is free to correct abuses without fear of political reprisal. However, the scope of this judicial authority is and should be limited. Many factors that legislators take into consideration, that are not considered by the judiciary, are important and appropriate areas of concern.

The advent of the "information age" has made it possible to devise apportionment plans with almost no deviation. This has been brought about in large part by the development of "census blocks" and highly sophisticated computers. Although developing reapportionment plans by computer using the breakdown of census blocks takes

into account precise mathematical figures and the distribution of voters along racial lines, it completely ignores most other concerns generally taken into consideration by legislative bodies. These concerns are often considered highly important by the voters. And, after all, it is the rights of the voters that are sought to be protected. Many of the problems foretold by Justice Harlan in his dissent in *Reynolds* have now come to fruition. In the redistricting plans which have come before this Court, precinct lines, beat lines, county lines (everything except state lines), in different cases, are largely or completely ignored. Census workers, hired temporarily, to count heads are taking maps and drawing lines on them for the sole purpose of allowing another census worker to have a specific area in which to count heads. These lines, drawn with no other consideration, and often by people with little experience, are now becoming the lines for precincts, supervisors' beats, legislative districts, and other political subdivision lines.

Even though the courts have attempted to be reasonably precise in determining what is required by the one-man, one-vote principle of the Constitution and probably have been much more so than would have a constitutional convention or a vote of the people, nevertheless, the courts have determined that there is some leeway. A 10% deviation is prima facie constitutional. Deviations of more than 16.4% must be "based on legitimate considerations incident to the effectuation of a rational state policy." *Connor,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (citation omitted); *see also Mahan v. Howell,* 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973) (When the Supreme Court was confronted with a 16.4% maximum deviation, which existed in Virginia's House of Delegates, the Court stated "[w]hile this percentage may well approach tolerable limits, we do not believe it exceeds them.").

Most litigants who have appeared before this Court seem to take the position that a 10% deviation is constitutional and that a deviation in excess of 16.4% is unconstitutional and in between is questionable. A 16.4% deviation, at first impression, seems to be fairly broad. Even a 10% deviation seems to

give some flexibility. However, if a deviation in excess of 16.4% is presumed to be unconstitutional, it might be helpful to analyze how much influence a voter actually loses in a district that is unconstitutionally apportioned because of a deviation of just over 16.4%. For purposes of analysis, it will be assumed that the ideal district is 10,000 voters.[3] There is a deviation of 8.3%, plus and minus, in two respective districts, thus causing a total deviation of 16.6%. The smallest district would have a population of 9,170 voters (10,000 times .083 equals 830; 10,000 minus 830 equals 9,170). The largest district would have a population of 10,830 (10,000 times .083 equals 830; 10,000 plus 830 equals 10,830). In the ideal district a voter would have an influence of 10/1000ths of 1% (1 divided by 10,000). A voter in the smallest district would have an influence of something less than 11/1000ths of 1% (1 divided by 9,130) and a voter in the largest district would have an actual influence of something more than 9/1000ths of 1% (1 divided by 10,830). Consequently, if it is assumed that districting plans are unconstitutional because of a maximum deviation of 16.6%, when the ideal district is 10,000 people, a redistricting plan would be unconstitutional because a voter in the smallest district had an actual influence of less than 2/1000ths of 1% more than the actual influence of a voter in the largest district (actually, it is just over 1.5/1000th of 1%). This analysis takes into account a voter's influence in electing one representative. If there are 100 representatives in a legislative body, as to the final adoption of legislation, the influence of each voter is further diluted by 51 (the number necessary for a majority).

For such a minimal loss of actual influence, federal courts are mandating massive reapportionments on the basis of having determined that such mathematical nicety is constitutionally required. The trial courts, more than any other courts, are seeing the actual effect of what is going on in one-man one-vote redistricting cases. Consider this scenario. A reapportionment plan does not pass muster because one district must have at least 400 more voters to pass constitutional criteria; in order to comply with court precedents, 400 voters in one county are attached to voters in another county to form a district. There is not only a county line separating these 400 voters from the rest of the district, but a river as well. These 400 voters have little or no contact with the other voters in the new district. They do not attend the same schools, they do not go to church together, they do not shop in the same towns, they do not meet at a coffee shop to discuss mutual problems, they have a different local governing body that assesses their taxes, and they have very little in common with the other voters in their new district. These 400 voters not only feel their vote has been diluted, they feel disenfranchised. Although this is an extreme illustration, it is not uncommon under the view that a county or state must reapportion with less than a 10% deviation or face extensive and expensive litigation in federal court. A much more common practice is to move voters on one side of a street to a new and different precinct than voters have voted in for generations. Oftentimes in local elections, a small segment of a community is separated from the rest of the community and put in a new district with voters with whom they have far less in common than their traditional precinct or district. Again, there is a feeling of isolation and loss of influence and, this is done on a frequent basis, in order that a voter might have 1.5/1000th of 1% to 2/1000ths of 1% more actual influence on the outcome of an election. Arbitrarily putting 10,000 voters here and 10,000 there to provide numerical equality doesn't necessarily provide more responsive government and it doesn't necessarily make government work better.

Despite improvements in getting and assembling large amounts of information, it is submitted that no one can know or assimilate information as to the tremendous amount of taxpayer money that has been spent on apportioning and reapportioning political bodies to comply with court rulings or to comply with what lawmakers perceive to be judicial

---

**3.** The Court recognizes that the reapportionment decisions have dealt with total population and not voters. Nevertheless, for purposes of this analysis, assumption is based upon the total number of voters in a district.

requirements. No one can calculate the number of hours devoted by public officials to resolving reapportionment issues, trying to live by court mandates. Oftentimes, other government problems are ignored because legislative bodies are trying to solve reapportionment according to what they think the courts will require. It is impossible to determine how frequently governmental bodies agree to redistricting plans not required by constitutional provisions simply because they cannot afford costly litigation or because they are unwilling to spend taxpayer dollars in that manner. The effect of these decisions demonstrates to this writer that very few of those responsible for handing down these decisions ever had the responsibility themselves of carrying out these decisions or trying to comply with them. Most have never had to justify breaking precinct, beat and county lines, dividing historical or economic communities of interest, nor to justify the enormous amount of effort and taxpayer dollars that go into accomplishing what the courts have mandated. Mathematical division that is almost precise is now possible. It is submitted that most voters care less about such mathematical precision when it changes their actual influence so little, than they desire to save tax dollars, avoid disruption and the breaking of so many political subdivision lines.[4]

■ The Forrest County Reapportionment Plan in place in 1991 contravened the Constitution because it was not justified on the basis of a rational state policy. However, it was not gross malapportionment. It did not result from any invidious effort to discriminate or any deliberate attempt to contravene the Constitution. The deviation results from population shifts between 1983 when the Plan was adopted and pre-cleared by the Justice Department and 1990 when the subsequent census was taken. The Plan now in place, pre-cleared by the Justice Department on July 31, 1992, passes muster in

regard to one-man, one-vote and is not an issue here.

In the 1960's, state legislatures generally refused to address legislative reapportionment, resulting in the *Reynolds v. Sims* case, *supra,* and the *White v. Regester* case, *supra.* Most all states resisted reapportionment. It could be said they were brought kicking and screaming into court. By now, most state legislative bodies have recognized that one-man, one-vote is a reality. They recognize that it is the law. They recognize that they must live with it. Most counties now start redistricting shortly after new census data is available. It might be noted that it takes the Census Bureau a considerable period of time to train workers and make the actual head count. The census count is frequently challenged. Just as it takes the federal government a considerable period of time to make the head count, it takes counties some time to bring about reapportionment.

In 1980, the Mississippi legislature and the Mississippi voters revised the Mississippi Constitution and provided for a more detailed and mandatory decennial reapportionment. *See* MISS. CONST. art. 13, § 254. This revised section goes into specific detail in establishing procedures for statewide legislative redistricting. It mandates that the state must reapportion itself on an expeditious basis. Mentioning this section has no bearing upon the present litigation, except it establishes the attitude of the state toward redistricting now as contrasted with the 1960's when state legislatures absolutely refused to reapportion themselves.

The question presented to this Court is not whether Forrest County must reapportion consistent with one-man, one-vote and the Voting Rights Act, but whether their actions in making these changes comport with the Constitution. In 1983, the Justice Department pre-cleared a Forrest County Reapportionment Plan. That Plan stayed in effect until July 31, 1992, when a new Forrest

---

4. In view of the fact that redistricting as ordered by the courts frequently requires dividing counties, beats, precincts or polling places, the dividing of distinct communities of interest and, in view of the expenses involved, the disruption of prior practices and customs, (people frequently don't like to change voting places or to vote in a place where they are not accustomed.), it is wondered if we are not giving the people more government than they want and more than is required in defining one-man, one-vote too precisely. Nevertheless, this Court is bound to follow the precedents established by prior controlling judicial decisions.

County Reapportionment Plan was pre-cleared by the Justice Department. The 1990 Census revealed that due to a shift in the population, Forrest County had a total deviation of 25.59%, although only a 15.02% deviation from the ideal district. Forrest County first received the 1990 census data on February 21, 1991. The County promptly started taking steps to develop a new plan. On March 7, 1991, the Board of Supervisors appointed a Bi–Racial Committee to develop a redistricting plan. The Bi–Racial Committee was composed of five white members and five African–American members. On March 26, 1991, the Bi–Racial Committee had its first meeting. By April 4, 1991, the Bi–Racial Committee voted to recommend a particular redistricting plan to the Board of Supervisors. A public hearing was conducted by the Board of Supervisors and the Bi–Racial Committee on April 18, 1991 in order to explain the Committee's proposal and receive comments from the public. By April 25, 1991, the Forrest County Board of Supervisors approved and adopted the Bi–Racial Committee's proposed redistricting plan. The Plan was submitted to the United States Justice Department on May 17, 1991. By a letter dated July 19, 1991, the United States Attorney General asked the Forrest County Board of Supervisors to provide additional information on the proposed redistricting plan. Forrest County responded to that request and provided the Attorney General with the desired information in a letter dated August 2, 1991. On October 7, 1991, the Forrest County Board of Supervisors were advised that the Attorney General had declined to pre-clear the proposed redistricting plan submitted on May 17, 1991. Ten days after pre-clearance was denied, the Bi–Racial Committee was reconvened on October 17, 1991. On January 23, 1992, the Bi–Racial Committee voted to recommend a new proposal for a redistricting plan to the Board of Supervisors. A public hearing was conducted on February 18, 1992 by the Board of Supervisors and the Bi–Racial Committee in order to explain the Committee's new proposal. On March 19, 1992, the Board of Supervisors formally adopted a modified version of the redistricting plan recommended by the Bi–Racial Committee. Minor revi-sions were made to the modified Plan by the Board of Supervisors on April 9, 1992. Thereafter, a submission formally presenting the Plan to the United States Attorney General was prepared and mailed to the Justice Department on May 29, 1992. On July 31, 1992, the Attorney General advised the Forrest County Board of Supervisors that no objections would be interposed to the County's new redistricting plan. Thus, the Plan was formally pre-cleared on July 31, 1992 and notices were mailed to the Mississippi Secretary of State and the Forrest County Commissioners of Election by August 5, 1992. The new pre-cleared Reapportionment Plan created two supervisory districts with African–American voting age majorities. African–Americans constitute 26.54% of Forrest County's total voting age population. Elections were held in 1991 under the old Forrest County Reapportionment Plan. The plaintiffs filed this lawsuit against Forrest County on October 21, 1991, some two weeks before the November, 1991 elections were to be held. However, the plaintiffs did not attempt to enjoin the upcoming elections and requested no hearing on the preliminary injunction, although the plaintiffs did ask for a preliminary injunction in their original complaint. Courts have no way of knowing what is in a complaint when it is first filed unless one of the parties takes some action to bring the matter to the court's attention.

Deviation from population norms can occur in any district at any time. For instance: A census is taken; a redistricting plan is legislatively adopted; it is pre-cleared; the next election is held; the next year, the next day, the next week, the next month a major disaster occurs—a large industry in town closes, thousands relocate; a flood wipes out a community, people relocate; a toxic hazard develops, people move—do these situations mandate reapportionment because there is 50% deviation from the norm, even though it is seven years until the next census? A constitutionally impermissible deviation exists. It can be proven by demographers. Does that require special elections and redistricting even before the next census?

A comparison of the case law relied on by the plaintiffs to the facts of this particular

case will help the Court in making its determination whether special elections are warranted in this case. Most of the cases cited by the plaintiffs, where special elections were ordered by the courts, were decided in the early 1970's when, as has been pointed out, many states and the counties in those states were fighting reapportionment.

One of the earliest one-man, one-vote cases cited by the plaintiffs is *Keller v. Gilliam*, 454 F.2d 55 (5th Cir.1972). In *Keller*, the Fifth Circuit ordered special elections to be held since the district court had erroneously failed to halt elections despite the *gross* disparity in the size of the districts of Lowndes County. *Id.* at 57. The second district had a population of 24,849 while the fourth district had a population of only 2,221. *Id.* at 55. The disparity ratio was more than 11 to 1. *Id.* at 55–58. A preliminary injunction to stop the elections of the board of supervisors had been sought by the plaintiffs before the elections. *Id.* at 55–56. However, the trial court determined that there was not enough time to have a new redistricting plan approved, so the trial court allowed the elections to go forward, although it ordered the board of supervisors to realign the districts. *Id.* The *Keller* case can be distinguished from the case at hand. In *Keller*, the plaintiffs sought a preliminary injunction to stop the upcoming elections. A hearing was conducted and the trial judge made a ruling denying the injunction more than five months before the elections. *Id.* at 55. In the present case, the plaintiffs filed their original complaint on October 21, 1991, not just during an election campaign but during the last days of an election campaign. In their complaint the plaintiffs asked the Court to "[i]ssue a preliminary injunction restraining the Defendants herein from conducting any further elections ... under the present and proposed supervisory re-districting scheme." At the time the original complaint was filed the November, 1991 elections were a little more than two weeks away. The plaintiffs did not ask the Court for an emergency preliminary injunction hearing. No pre-election relief was sought by the plaintiffs. Instead the plaintiffs sat back while five board of supervisors candidates, who ran in the November, 1991 elections, were elected to serve a four year term. The deviation in this case is only 25.59% compared to a much greater deviation in the *Keller* case.

The plaintiffs likewise rely on the case of *Hall v. Issaquena County Bd. of Supervisors*, No. 71–2313 (5th Cir. July 29, 1971), which is cited in the *Keller* case. Even though special elections were ordered in that case, there was no reported opinion in the *Hall* case. The only thing the Court has is a short excerpt from the *Hall* case which is quoted by the *Keller* case. The excerpt shows that final elections were to take place after the district court approved a redistricting plan. The factual situation in that case is unknown. The Court has no benefit of the rationale behind ordering special elections in that case.

*Howard v. Adams County Bd. of Supervisors*, 453 F.2d 455 (5th Cir.1972), is another case cited by the plaintiffs where special elections were ordered by the court. A footnote is the only place in the *Howard* case where it is indicated that the Fifth Circuit ordered final elections. *Howard*, 453 F.2d at 456 n. 1. The rationale behind the ordering of the final elections is not addressed by the *Howard* opinion. Although the fact that special elections were mandated appears only in the footnote, the court in the text of the opinion stated:

> As late as 1970, the Board of Supervisors, the county's legislative body, was elected from five electoral districts which varied in population from 800 to 16,832. These districts were patently malapportioned. Redistricting was essential to a constitutionally-valid election ...

*Id.* at 456. Thus, the disparity ratio was more than 21 to 1. It should also be noted that the 1970 census data would not have been available so this malapportionment would have existed at least since the 1960 Census and probably for many years prior thereto. The malapportionment in this case is not in the least bit comparable to the malapportionment in the *Howard* case.

Another case relied upon by the plaintiffs involves a situation which arose prior to the taking of the 1970 Census. In *Taylor v. Monroe County Bd. of Supervisors*, 421 F.2d

1038, 1039 (5th Cir.1970), the plaintiffs filed a suit against Monroe County for malapportionment on June 23, 1967. By April, 1969, the district court entered an order requiring Monroe County to realign the districts. *Id.* The case was appealed to the Fifth Circuit. The Fifth Circuit recognized that the plaintiffs were not entitled to special elections as a matter of right. *Id.* at 1041–42. However, the court went on to state that in some situations special elections are necessary, even though undesirable at best. *Id.* at 1042. The Fifth Circuit reversed the *Taylor* case and remanded it back for the trial court to decide whether special elections were necessary. The court concluded: "that the trial court should have ascertained 'expeditiously' just how much time and effort would be involved in preparing for and holding a special election which would certainly have permitted legally elected officials to have served at least more than half the current term of office." *Id.* at 1042. The court also directed the trial court *to look at the extent of the malapportionment* existing under the old boundary lines and the basic equities of the respective positions of the parties before deciding if special elections were necessary. *Id.* at 1042–43. Even though it is not reported whether special elections were ordered, the factors set out by the Fifth Circuit in *Taylor* are helpful in deciding whether special elections are required under the present situation. The Monroe County supervisory districts varied in population from 2,813 to 11,257. *Id.* at 1039. The *Taylor* case presented a disparity ratio of 4 to 1. Even in that case, the Fifth Circuit did not itself direct new elections. It left that up to the discretion of the trial court consistent with the views expressed by the Fifth Circuit.

Plaintiffs likewise rely on the case of *Cook v. Luckett*, 575 F.Supp. 479 (S.D.Miss.1983). In *Cook v. Luckett*, preliminary injunctions in five counties were issued by this court prohibiting the holding of the board of supervisors elections. *Id.* In making its decision the court stated:

> Before this Court today are counties who have had the 1980 census for some time, at least two years, and for the most part have failed to make a submission to the Justice Department as required by Section 5 of

the Voting Rights Act until early in this year, an election year.

*Id.* at 484. Accordingly, Judge Barbour found that the board of supervisors in those five counties had abdicated their responsibility to redistrict. *Id.* at 484. That holding is in sharp contrast to the actions of Forrest County in the present case. From the time the census material was made known to Forrest County there was constant attempt by Forrest County to draft a constitutional redistricting plan. The court in *Cook* did not find such an attempt. Additionally, the *Cook* case involved elections in 1983, occurring some two years after the census data became available. This case involves elections in 1991 with census data not becoming available until early 1991, only months before the upcoming elections.

Although the cases discussed indicate some situations where special elections are necessary, this Court has found no Fifth Circuit or United States Supreme Court case that addresses the exact same issue this Court is faced with today, i.e. how much time should a governing body have to redistrict itself after a census report demonstrates districts that were constitutionally apportioned have become malapportioned due to population shifts? Two other circuits, however, have addressed this issue.

In *French v. Boner*, 786 F.Supp. 1328 (M.D.Tenn.1992), *aff'd*, 963 F.2d 890, 891 (6th Cir.1992), the Sixth Circuit was faced with the same issue as this Court, except that case involved one district that contained almost three times as many people as did another district and the total deviation between districts was 119.78% (Exhibit B to Defendants' Motion for Partial Summary Judgment) compared to the 25.59% deviation involved in this case. Although finding gross malapportionment, the court in that case stated:

> The question in this municipal reapportionment case is whether the Equal Protection Clause requires the City of Nashville to conduct new elections for 35 local legislators before their four-year terms expire in 1995. Nashville conducted its last city election for its 35 district council members according to a legislative apportionment

plan based on the 1980 census figures rather than the 1990 census figures. The City held the election in August 1991, as required by its Charter. The Census Bureau did not make the 1990 census figures available to the city until a date in the spring of 1991. The date was too late for the City to devise and adopt a completely new districting plan and put it into effect with sufficient notice to allow candidates to qualify and campaign prior to the impending August city election.

Because of population shifts from 1980 to 1990, the largest of the 35 council districts has almost three times as many people as the smallest district.

The question before us is whether the City has a constitutional duty to rerun the elections held just after the new decennial census data became available in 1991 but before the old apportionment plan could be changed and a new one put into effect prior to the impending election.

. . . In any system of representative government, it is inevitable that some elections for four-year or longer terms will occur on the cusp of the decennial census. The terms inevitably will last well into the next decade; and, depending on shifts in population in the preceding decade, the representation may be unequal in the sense that the districts no longer meet a one-person, one-vote test under the new census.

. . . [M]athematical equality in representation is not required at all times during the census and election cycles. Values other than mathematical equality in preserving majority rule are also at stake. In order to maintain relative mathematical equality in a population constantly on the move, we would have to have short terms of office and annual census updates. Short terms would sacrifice the stability and experience in office that longer terms contribute. Refusal to honor the preference of state and local bodies for longer terms would increase the costs of elections for taxpayers and candidates and would make it more difficult for citizens of limited means to participate in local elective politics. If new elections were ordered here,

the process would undermine the settled expectations that both voters and the elected officials hold as a result of the election last year.

. . . The principles of mathematical equality and majority rule are important, but we should not allow them to outweigh all other factors in reviewing the timing of elections.

. . . We do not believe that considerations of mathematical equality in representation or the presumption in favor of redistricting every ten years outweigh the considerations outlined above concerning the validity of four-year terms, the settled expectations of voters and elected officials, the costs of the elections, and the need for stability and continuity of office.

*Id.* at 891–92. Thus, the Sixth Circuit in *French* recognized that there was no constitutional duty to conduct special elections every time government officials are elected under a malapportioned plan where such is caused by a population shift occurring over a ten year period and the governing body does not have time to reapportion after new census data is available and before the next election occurs.

In *Ramos v. Illinois,* 781 F.Supp. 1353 (N.D.Ill.), *aff'd,* 976 F.2d 335 (7th Cir.1992), the Seventh Circuit likewise agreed with the Sixth Circuit's *French* decision. In *Ramos,* the Seventh Circuit recognized that there is no constitutional requirement that cities change their customary four-year terms of the officials "in order to avoid the delay that occurs once every twenty years in implementing the new census figures." *Ramos,* at 341. The *Ramos* Court held:

The four-year terms that Chicago alderman serve merely indicate that every fifth election (i.e. when the election year falls on the same year that the new census data becomes available) likely will result in a four-year delay in using the new census data. But this simple consequence of the two different schedules (i.e. census every ten years, elections every four) does not diminish the voting power of any protected minority; there is merely a four-year time lag that occurs every other decade between redistricting and elections.

*Id.* at 341. The Court in *Ramos* held that special elections were not necessary despite the malapportionment. *Id.* The trial court in *Ramos* quoting from the *Reynolds* case, *supra,* stated:

We recognize, however, that "legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a *timely fashion after having had an adequate opportunity to do so.* . . ."

*Ramos,* 781 F.Supp. at 1357 (citation omitted) (emphasis added). The Court in *Ramos* denied plaintiffs' request that special elections should be held despite its finding:

. . . that Hispanics constitute a majority in six wards. Under the 1985 plan, there currently are only four Hispanic aldermen in Chicago's City Council. The plaintiffs assert that a map based on the new census figures will enable voters to elect at least two additional Hispanic aldermen. . . . The PACI plaintiffs alleged that studies of the new census figures showed that the 1985 map fractured and diluted African–American voting strength.

*Id.*

The Court continued:

. . . Illinois' redistricting scheme, as implemented in the 1991 elections, violated neither constitutional requirements nor the Voting Rights Act.

*Id.* at 338. The Court quoting from the district court stated: "we are not dealing with an unreasonably delayed reapportionment procedure." *Id.* at 338. The Court further explained its decision:

*Redistricting is complex; obtaining new census data is merely the first step* toward developing and approving a new map for the City. Therefore, the critical question is whether the 1991 election, which was based on a ward map approved in 1985 using 1980 census data, was valid under *Reynolds? Reynolds'* explicit language concerning the probable 'imbalance' in the map toward the end of the decennial period demonstrates that Chicago's 1991 elec-

tion represents no constitutional violation. We hold that the district court properly dismissed the plaintiff's constitutional claims for a failure to state a claim upon which relief may be granted.

*Id.* at 340 (emphasis added).

The voters of Mississippi are situated in an analogous situation as the voters of Illinois (*Ramos* case) and probably many other states. One election every 20 years (1971, 1991, 2001, etc.) will be held so close to the taking of the decennial census that decision makers acting in good faith may be unable to devise a constitutionally-acceptable reapportionment in time for the regularly scheduled elections. Does that mean that the Constitution requires the holding of special elections in every state in which this occurs once every 20 years? This Court thinks not.

The courts as well as the other two branches of government are relevant to America, its well-being and its future. Even though courts are "wordsmiths," we cannot perform our functions in a completely theoretical, philosophical vacuum. We must consider the effect our decisions have on the operation of government. This does not suggest in any way that local governments should be allowed to discriminate or that legislative malapportionment having a significant impact on a voter expressing his will should be permitted.

In 1983, the United States Supreme Court revisited the issue of one-man, one-vote. In a five to four decision written by Mr. Justice Powell the Court in the case of *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) refused to declare unconstitutional a Wyoming House of Representatives apportionment in which the average deviation was 16% and the maximum deviation was 89%. The Wyoming statute on legislative apportionment provided that each county would have at least one representative. *Id.* at 837, 103 S.Ct. at 2693. Niobrara County, the state's least populous county, had a population of less than half of the ideal district. *Id.* at 839, 103 S.Ct. at 2694. Under the Wyoming Constitution and statutory scheme, the Wyoming House of Representatives was increased from 63 to 64 so that Niobrara County could have its own repre-

sentative. *Id.* at 840, 103 S.Ct. at 2695. Appellants in that case appealed on a very narrow issue. They alleged that "[b]y granting Niobrara County a representative to which it is not statutorily entitled, the voting privileges of Plaintiffs and other citizens and electors of Wyoming similarly situated have been improperly and illegally diluted in violation of the 14th Amendment. . . ." *Id.* at 840, 103 S.Ct. at 2695. Presented with this narrow issue, the Court held:

> In short, this case presents an unusually strong example of an apportionment plan the population variations of which are entirely the result of the consistent and non-discriminatory application of a legitimate state policy. This does not mean that population deviations of any magnitude necessarily are acceptable.

*Id.* at 844–45, 103 S.Ct. at 2696–97 (citation omitted).

> Here we are not required to decide whether Wyoming's nondiscriminatory adherence to county boundaries justifies the population deviations that exist throughout Wyoming's representative districts. Appellants deliberately have limited their challenge to the alleged dilution of their voting power resulting from the one representative given to Niobrara County. The issue therefore is not whether a 16% average deviation and an 89% maximum deviation, considering the state apportionment plan as a whole, are constitutionally permissible. Rather, the issue is whether Wyoming's policy of preserving county boundaries justifies the additional deviations from population equality resulting from the provision of representation to Niobrara County.

*Id.* at 846, 103 S.Ct. at 2698 (citations omitted).

> It scarcely can be denied that in terms of actual effect on appellants' voting power, it matters little whether the 63–member or 64–member House is used. The District Court noted, for example, that the seven counties in which appellants reside will elect 28 representatives under either plan. The only difference, therefore, is whether they elect 43.75% of the legislature (28 of 64 members) or 44.44% of the legislature (28 of 63 members). . . . The district Court aptly described this difference as "de minimis."

*Id.* at 847, 103 S.Ct. at 2698 (citations omitted).

The *Brown* case cannot be relied upon to support an 89% maximum deviation from population equality. However, it does indicate that the Supreme Court in this more recent pronouncement is taking into consideration factors other than population equality alone. The Court pointed out that the 89% deviation in the Wyoming case did not have that much actual impact on the influence of the voters (whether the voters in seven counties elected 43.75% or 44.44% of the legislature). The 89% deviation in the Wyoming case is nothing like the 41 to 1 or 16 to 1 disparity found in the *Reynolds* case, *supra.*

Although the *Reynolds* Court specifically found that the federal analogy (the fact that each state has two senators regardless of population) is not applicable in state legislative reapportionment cases, nevertheless, it is noteworthy that the 1990 Census reveals that the State of Wyoming has a population of only 453,588 and the State of California has a population of 29,760,021. Thus, a voter in the State of Wyoming has almost sixty-six times as much influence in the United States Senate as a voter in California, which is much more disparity than found in the *Reynolds* case. *See* Public Information Office, Bureaus of the Census—CB 91–100. It is recognized that giving each state, regardless of population, two senators was a result of the Great Compromise between the small states and the large states when our Constitution was brought forth. This same concept was carried over into the provisions for an electoral college in electing the President of the United States. No one argues that our national government is not a representative government. And, these provisions are all in the same Constitution of which the Fourteenth Amendment is a part. Again, attention is called to this fact only to indicate that obtrusive action on the part of federal courts should be cautious and restrained. This is in accord with the opinion rendered by the Fifth Circuit in *Chisom v. Roemer,* 853 F.2d 1186 (1988), wherein the court said:

"But, 'intervention by the federal courts in state elections has always been a serious business,' not to be lightly engaged in. Indeed, even after an adjudication on the merits that a legislative apportionment plan violated the Constitution, the Supreme Court invited the use of a velvet glove over the mailed fist...."

*Id.* at 1189 (citations omitted).

We consider significant the Supreme Court's action in *[Whitcomb v.] Chavis,* [396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757 (1970)]. In staying the reapportionment plan ordered by a three-judge court, the Supreme Court permitted the conduct of an election under the old scheme which had been found constitutionally infirm. In dissenting from the refusal to vacate their stay order, Justice Douglas pointedly stated: "The State contends that without a stay it will be forced to conduct the forthcoming election under the reapportionment plan of the District Court. By granting the stay, however, this Court has equally forced the appellees to go through the election under the present scheme which was held unconstitutional by the District Court." Nonetheless the court permitted the election to proceed.

*Id.* at 1190.

It is recognized that there is a difference between enjoining an election and in ordering new elections. The *Chisom* court was presented with the question of enjoining elections while this Court is presented with the question of ordering new elections. But the admonition that this is a matter "not to be lightly engaged in" is applicable in both situations.

In *Brown, supra,* the Court indicated that what has been previously perceived as approaching maximum total deviation that is constitutionally permissible, may have been a misperception. The Court said:

"[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population however, creates a prima facie case of discrimination and therefore must be justified by the State. *See Swann v. Adams,* 385 U.S. 440, 444, 17 L.Ed.2d 501, 87 S.Ct. 569 [572] (1967) ("De minimis deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases suggests that differences of this magnitude will be approved, *without a satisfactory explanation grounded on acceptable state policy*"). The ultimate inquiry, therefore, is whether the legislature's plan "may reasonably be said to advance [a] rational state policy" and, if so, "whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits."

*Brown,* 462 U.S. at 842–43, 103 S.Ct. at 2695–97 (citations omitted) (emphasis added).

Courts have consistently held that the extent of deviation and other equitable considerations should be taken into account. The deviation in this case was relatively minor. Although not necessary for a decision in this case, this Court feels that the deviation involved in this case was de minimis.[5] Forrest County acted in good faith. Accordingly, this Court finds that the Forrest County Board of Supervisors acted in accord with

---

**5.** The statistical data before the Court in this case relates to total population, not qualified voters. Consequently, this Court cannot calculate a precise difference in actual influence of voters in the various beats of Forrest County. However, if you were to use total population figures as voters, the difference in this case would be about the same as in the examples analyzed, that is, approximately 2/1000ths of 1%. (Beat Five has a population of 14,949. One percent divided by 14,949 equals something less than 7/1000ths of 1%. Beat Four has a population of 11,622. One divided by 11,622 equals something less than 9/1000ths of 1%. This produces a difference of roughly 2/1000ths of 1%). Since the number of voters would be less than the total population figures, the difference in influence of voters would be slightly more, but not significantly more.

the Constitution in redistricting according to one-man one-vote. This opinion takes into account the extent of the deviation and the fact that the Forrest County Board of Supervisors had to gather and assimilate demographic information, digest this information, make political decisions and obtain Justice Department pre-clearance.

The courts have had to become involved in what should be a legislative function. Our obtrusion should be no more than the Constitution requires. The Constitution does not require anything that is impossible of performance. The performance of the Forrest County Board of Supervisors in this case was reasonable. The Constitution, under the facts of this case, requires no more. No special elections, under the one-man one-vote principle, will be ordered.

### WAIVER

Since this Court has already denied the plaintiffs' request for special elections, the Court does not find it necessary to consider the defendants' argument that the plaintiffs have waived their right to special elections under the one-man, one-vote claim, even though this Court does recognize that waiver can be a valid defense to a one-man, one-vote claim when the plaintiffs do not seek pre-election relief. *See Tucker v. Burford*, 603 F.Supp. 276 (N.D.Miss.1985) (the district court held that the plaintiffs waived their right to relief with regard to their one-man, one-vote claim, by failing to seek preelection relief). The Court does point out that the plaintiffs did not seek any effective preelection relief. They did not seek a preliminary injunction hearing.

### CONCLUSION

Plaintiffs' Motion for Partial Summary Judgment and Motion for Class Certification are DENIED. Defendants' Motion for Partial Summary Judgment on the question of holding special elections in regard to the one-man, one-vote issue is GRANTED. A Judgment will be entered accordingly.

SO ORDERED AND ADJUDGED.